[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11009
_____

D.C. Docket No. 2:16-cv-00690-RDP

MARNIKA LEWIS,
ANTOIN ADAMS,
ALABAMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION
FOR THE ADVANCEMENT OF COLORED PEOPLE,
GREATER BIRMINGHAM MINISTRIES,
MARIKA COLEMAN,
JOHN ROGERS,
PRISCILLA DUNN,
JUANDALYNN GIVAN,
LOUISE ALEXANDER,
WILLIAM MUHAMMAD,
RODGER SMITHERMAN,
OLIVER ROBINSON,
ALABAMA LEGISLATIVE BLACK CAUCUS,
MARY MOORE,

Plaintiffs - Appellants,

versus

GOVERNOR OF ALABAMA,
in her Official Capacity as Governor of the State of Alabama,
ATTORNEY GENERAL, STATE OF ALABAMA,
in his Official Capacity as Attorney General of the State of Alabama,

STATE OF ALABAMA, THE,
BIRMINGHAM, CITY OF, THE,
MAYOR OF BIRMINGHAM,
in his official Capacity as Mayor of Birmingham,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(December 13, 2019)

Before ED CARNES, Chief Judge, WILSON, WILLIAM PRYOR, MARTIN, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, TJOFLAT, and MARCUS, Circuit Judges.[*]

NEWSOM, Circuit Judge, delivered the opinion of the Court, in which ED CARNES, Chief Judge, and WILLIAM PRYOR, BRANCH, GRANT, TJOFLAT, and MARCUS, Circuit Judges, joined.

WILLIAM PRYOR, Circuit Judge, filed a concurring opinion.

WILSON, Circuit Judge, filed a dissenting opinion, in which MARTIN, JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges, joined.

JORDAN, Circuit Judge, filed a dissenting opinion, in which WILSON, MARTIN, ROSENBAUM, and JILL PRYOR, Circuit Judges, joined.

_____

[*] Judges Gerald Bard Tjoflat and Stanley Marcus were members of the en banc Court that heard oral argument in this case. Judges Tjoflat and Marcus took senior status on November 19, 2019, and December 6, 2019, respectively, and both have elected to participate in this decision pursuant to 28 U.S.C. § 46(c)(2). Judges Robert J. Luck and Barbara Lagoa joined the Court on November 19, 2019, and December 6, 2019, respectively, and did not participate in these en banc proceedings.

NEWSOM, Circuit Judge:

This case arises out of a political tug-of-war between the State of Alabama and the City of Birmingham over economic policy—in particular, over minimum-wage rates. We'll delve into the details soon enough, but here's the short story: In 2015, the Birmingham City Council petitioned the Alabama Legislature to raise the minimum wage, statewide, above the $7.25 federal baseline. When the Legislature declined—and following some back-and-forth with state officials—the City took matters into its own hands, eventually adopting a local ordinance that immediately increased the minimum wage within Birmingham's city limits by 39%, to $10.10. The Legislature responded by enacting a statute that aimed to standardize wage policy throughout the state by prohibiting and "void[ing]" any local law that required employers, among other things, to pay wages higher than state or federal law mandates. That statute—Act No. 2016-18—had the effect of nullifying Birmingham's minimum-wage ordinance.

Two African-American minimum-wage employees who work in Birmingham at a rate lower than the $10.10 prescribed by the City's ordinance brought suit, alleging that Act No. 2016-18 violated (as relevant here) the Equal Protection Clause of the Fourteenth Amendment. Rather, though, than suing their employers—who, pursuant to the Act, were refusing to pay the $10.10—the employees opted to sue (again, as relevant here) the Alabama Attorney General.

3

That choice presents us with an important threshold question:  Do the employees have Article III standing to sue the Attorney General?  We hold that they do not— in particular, because they cannot demonstrate either (1) that their alleged injuries are fairly traceable to his conduct or (2) that those injuries would be redressed by the declaratory and injunctive relief they have requested.  Because we conclude that the employees lack standing to sue, we need not (and indeed cannot) consider the merits of their equal-protection claim.

# I

## A

The seed of this appeal was planted in April 2015, when the Birmingham City Council adopted a resolution formally urging the Alabama Legislature to raise the minimum wage, statewide, above the $7.25 federal rate.  The Legislature declined to do so, and in response, in August 2015, the City Council enacted an ordinance, No. 15-124, that gradually increased the minimum wage for Birmingham-based workers—the rate would go up to $8.50 roughly one year after the ordinance's enactment, and then to $10.10 a year after that.

About six months later, in early February 2016—before the initial increase prescribed by Ordinance No. 15-124 had gone into effect—a member of the Alabama House of Representatives introduced a bill, HB 174, to standardize labor policy throughout the state and, in particular, to establish a uniform statewide

4

minimum wage. To that end, HB 174—which would become Act No. 2016-18, the law challenged here—did two things. First, it expressly prohibited local "mandate[s]" obligating employers to give their employees "any employment benefit, including . . . wage[s], . . . that is not required by state or federal law" and declared all such mandates "void." Ala. Act No. 2016-18 § 2(b)–(c). Second, and more generally, it "preempt[ed] the entire field of regulation in [Alabama] touching in any way upon . . . wages . . . provided by an employer to an employee . . . to the complete exclusion of any policy, ordinance, rule, or other mandate promulgated or enforced by any county, municipality, or other political subdivision of this state." *Id.* § 6(b). So while HB 174 didn't itself specify a minimum wage, it would, if adopted, effectively transform the federal minimum into both a floor and a ceiling—thereby nullifying Birmingham's ordinance. The Alabama House of Representatives passed HB 174 on February 16, 2016, one week after it was introduced.

With HB 174 winding its way through the state legislative process, the Birmingham City Council moved to accelerate the implementation of its own minimum-wage law. On February 23, 2016, it adopted a second ordinance—No. 16-28, at issue here—which *immediately* raised the minimum wage for Birmingham-based workers to $10.10. The new ordinance not only imposed a $100-per-day-per-employee penalty on any employer who failed to comply but

5

also gave aggrieved employees an express private right of action against their employers.  In particular, the ordinance stated that—

> Any Employee who is paid less than the minimum wage established under this Ordinance may bring a civil cause of action against his/her Employer for the full amount of wages due from the Employer in any court of competent jurisdiction and, upon prevailing, shall be awarded any appropriate legal or equitable relief, including: unpaid wages and an additional two times that amount as liquidated damages; reinstatement; actual damages; civil penalties; and reasonable attorneys' fees and costs.

Birmingham, Ala., Ordinance No. 16-28 (Feb. 23, 2016).

Because Ordinance No. 16-28 raised the minimum wage immediately, rather than gradually over the two-year period contemplated under its predecessor, Birmingham-based businesses faced an overnight 39% spike in minimum-wage costs.  Perhaps not surprisingly, many of them panicked.  In an effort to calm their fears, the Alabama Attorney General issued the following press release on the afternoon of February 23, shortly after Ordinance No. 16-28 was promulgated:

> My office has been contacted by local businesses and officials concerned about the impact of the City of Birmingham's ordinance establishing a city-wide minimum wage of $10.10 per hour, which purports to be effective on February 24.  The ordinance could impose fines and penalties on local businesses who do not comply.  Because this ordinance does not provide a reasonable time for employers to prepare to comply with the new minimum wage, it could greatly disrupt the Birmingham economy.
>
> I am issuing this statement to prevent that disruption and to assure Birmingham businesses that, despite the terms of the ordinance, they will have a reasonable time to prepare to comply. Under Alabama law, the ordinance cannot take effect immediately.

6

The City of Birmingham cannot impose an unreasonable restriction on the conduct of business by mandating an immediate increase in the minimum wage without providing a reasonable period of time to comply.

The Alabama Legislature is currently addressing this issue and I expect it will be resolved shortly without adversely affecting the citizens of Birmingham.

The very next day—February 24—Birmingham's mayor signed Ordinance No. 16-28 into law, thereby immediately raising Birmingham's minimum wage to $10.10 per hour.  The ordinance's effect, though, was short-lived.  On February 25, the Alabama Senate passed HB 174, and the Alabama Governor signed it into law as Act No. 2016-18 the same day, thereby voiding Birmingham's ordinance and effectively reinstating a $7.25 minimum wage statewide.

**B**

Plaintiffs Marnika Lewis and Antoin Adams are African-American employees who work within the city limits of Birmingham for a wage lower than the $10.10 per hour prescribed by Ordinance No. 16-28.  Although the ordinance gives aggrieved employees an express private right of action to sue employers who fail to pay the mandated hourly rate, Lewis and Adams didn't sue their employers. Had they done so, their constitutional challenge to the state law likely still would have arisen, albeit in a different manner and procedural posture.  Lewis and Adams would have complained that their employers had violated Ordinance No. 16-28 by failing to pay them $10.10; their employers presumably would have defended on

7

the ground that Act No. 2016-18 voided the Birmingham ordinance; and Lewis and Adams, in turn, would have challenged the Act's constitutionality.

Lewis and Adams opted to go a different route—which, in turn, teed up the standing-related issues that underlie our decision. Rather than sue their employers, Lewis and Adams—joined by the Alabama NAACP, Greater Birmingham Ministries, the Alabama Legislative Black Caucus, and African-American members of the Alabama House of Representatives and Senate—filed a civil-rights action in federal court against the State of Alabama, the Alabama Attorney General, the City of Birmingham, and the Mayor of Birmingham. Among other claims, Lewis and Adams alleged that Act No. 2016-18 was enacted with the intent to discriminate against them on account of their race in violation of the Equal Protection Clause of the Fourteenth Amendment.[1]

In support of their equal-protection claim, Lewis and Adams (whom we'll just call "plaintiffs") cited various statistics indicating that the Act may disproportionately impact African-Americans—for instance, they said, Birmingham's population is 73% African-American and, among hourly-wage earners in Birmingham, 37% of African-American workers earn $10.10 or less,

---

[1] Plaintiffs originally brought a total of nine claims, including causes of action under the Thirteenth Amendment, the Fourteenth Amendment's Privileges or Immunities Clause, the Fifteenth Amendment, and the Voting Rights Act of 1965. Only the equal-protection claim is before the en banc Court.

8

while only 27% of white hourly-wage earners fall below that threshold.  Plaintiffs

also emphasized the racial demographics of the state and local electorates:

Whereas Birmingham's mayor and city council are "elected by a majority-black

local electorate," they explained, the Alabama Legislature is "elected by a

statewide majority-white electorate."  With respect to Act No. 2016-18 itself,

plaintiffs stressed the "unusual speed" with which it was introduced, passed, and

signed—the entire process taking a total of 16 days—as well as what they called

the "highly racially polarized" votes in the Alabama Legislature that led to its

approval.[2]  Most dramatically, plaintiffs asserted—by reference to a long and

detailed narrative chronicling the state's sorry civil-rights history—that Act No.

2016-18 "perpetuates Alabama's *de jure* policy of white supremacy, in particular

its suppression of local black majorities through imposition of white control by

state government."

---

[2] In this connection, plaintiffs' complaint alleged (1) that the bill that became Act No. 2016-18 was introduced by "a white representative of the [overwhelmingly white] Birmingham suburb of Mountain Brook"; (2) that the bill was voted out of committee in the House of Representatives "by a vote of 10–3," with "[a]ll ten supporters . . . [being] white"; (3) that the House approved the bill by a 73–31 vote, with all members "voting in favor . . . [being] white" while "all twenty-seven African-American Representatives voted against"; (4) that a "white senator representing the [also predominantly white] Birmingham suburb of Vestavia Hills" advanced the bill through the Senate; (5) that the Senate passed the bill by a 23–12 roll-call vote, with "[a]ll Senators voting in favor [being] white" and "all seven African-American members of the Senate vot[ing] against passage"; and (6) that several "white legislators" had engaged in "racial stereotyping" by expressing concern that raising the minimum wage might actually hurt poorer workers.

To redress the economic injuries that they claimed to have suffered, plaintiffs sought three forms of relief: (1) "[a] judgment declaring that Act 2016-18 violates" the Equal Protection Clause; (2) an injunction "[d]irecting [the Alabama Attorney General] to give notice to Alabama legislators and to members of the public" that the Act is unconstitutional; and (3) an injunction "ordering . . . [the] City of Birmingham and/or . . . Mayor Bell to enforce" the City's minimum-wage ordinance.

The district court dismissed the complaint.  It concluded (1) that plaintiffs lacked Article III standing to sue any of the defendants, (2) that the Attorney General was an improper defendant under *Ex parte Young*, 209 U.S. 123 (1908), and (3) that, in any event, plaintiffs had failed to allege a plausible equal-protection claim because there was an "obvious alternative explanation"—*i.e.*, other than intentional discrimination—for the Legislature's conduct.

Importantly for present purposes—because it serves to narrow and frame the issues before us—a panel of this Court affirmed the district court's dismissal in all claims save one:  With respect to the equal-protection claim against the Alabama Attorney General, the panel reversed.  In particular, the panel held, as an initial matter, that plaintiffs had standing to sue the Attorney General because his "broad authority to interpret and enforce" Act No. 2016-18 "illustrate[d] his Article III connection" to plaintiffs' injuries, and because an order declaring the Act

10

unconstitutional and enjoining the Attorney General from enforcing it "would go a long way toward redressing the plaintiffs' injuries."  Separately, the panel concluded that the Attorney General had a sufficient connection to the enforcement of the Act to render him a proper defendant under *Ex parte Young*.  And finally, as to the merits, the panel held that plaintiffs had adequately alleged discriminatory intent to state a plausible equal-protection claim.  *Lewis v. Governor of Ala.*, 896 F.3d 1282, 1290–97 (11th Cir. 2018), *opinion vacated and reh'g en banc granted*, 914 F.3d 1291 (11th Cir. 2019).

A majority of the active judges of this Circuit voted to rehear the case en banc.  The questions now before the full Court are (1) whether plaintiffs have Article III standing to sue the Alabama Attorney General, (2) whether the Attorney General is a proper defendant under *Ex parte Young*, and (3) whether plaintiffs' complaint states a plausible claim of racial discrimination under the Equal Protection Clause.[3]  We now hold that plaintiffs lack standing to sue the Attorney General—in particular, that they cannot establish the standing doctrine's "traceability" or "redressability" requirements.  Because we conclude that plaintiffs have no standing—and thus that the federal courts have no jurisdiction

---

[3] As already noted, several groups of plaintiffs (including individuals who are not Birmingham minimum-wage earners) initially brought a whole host of claims against a whole host of defendants.  Our en banc review, though, is limited to whether the wage-earner plaintiffs have standing to bring an equal-protection claim against the Alabama Attorney General.

11

over plaintiffs' lawsuit—we will not proceed to consider the ensuing questions whether the Attorney General is a proper defendant under *Ex parte Young* or whether plaintiffs have stated a plausible equal-protection claim on the merits.

## II

Article III of the United States Constitution limits the "judicial Power"—and thus the jurisdiction of the federal courts—to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  The "standing" doctrine is "an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992).  In order to establish her standing to sue, a plaintiff must satisfy three (by now familiar) criteria.  First, the plaintiff must demonstrate that she has suffered an "injury in fact"—an invasion of a legally protected interest that is both (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citations omitted).  Second, the plaintiff must show a "causal connection" between her injury and the challenged action of the defendant—*i.e.*, the injury must be "fairly . . . trace[able]" to the defendant's conduct, as opposed to the action of an absent third party. *Id.* (citation omitted).  Finally, the plaintiff must show that it is likely, not merely speculative, that a favorable judgment will redress her injury. *Id.* at 561 (citation omitted).

Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim,

12

no matter how weighty or interesting.  We therefore turn, at the outset, to examine whether plaintiffs here satisfy each of the standing doctrine's three components—in the lingo, "injury-in-fact," "traceability," and "redressability."[4]

### A

We can make quick work of the injury-in-fact requirement.  As relevant here, plaintiffs allege that they suffered an injury that is actual, concrete, and particularized—namely, the economic loss resulting from not being paid the $10.10 minimum wage prescribed by the preempted Birmingham ordinance.  We agree.  Economic harm, we have held, is a "well-established injur[y]-in-fact under federal standing jurisprudence," *Adinolfe v. United Tech. Corp.*, 768 F.3d 1161, 1172 (11th Cir. 2014), and the difference between $7.25 and $10.10 per hour is real.  Enough said.

### B

So, on to traceability.  Plaintiffs assert that their "injuries are a result of Act 2016-18" and, as particularly relevant here, "the Attorney General's conduct with respect to the Act."  Br. of Appellants at 19.  But what, exactly, do they say the Attorney General did wrong—how, exactly, do they trace their injuries to his "conduct"?  On an appropriately charitable reading of their pleadings and briefs,

---

[4] As with all jurisdictional issues, we review the issue of standing de novo.  *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cty.*, 122 F.3d 895, 903 (11th Cir. 1997).

13

plaintiffs seem to be offering two theories, which we'll call the "*ex ante*" and the "*ex post*." First—*ex ante*—plaintiffs complain that the Attorney General "refused to perform his statutory duty to inform the Legislature and the Governor of Act 2016-18's unconstitutionality." *Id.* at 15. Second—*ex post*—they assert (albeit more vaguely) that as a result of the Attorney General's conduct in connection with the enforcement of the Act—either because he is actually enforcing it, has threatened to enforce it, or at the very least hasn't "indicat[ed] his intent not to enforce" it—the City of Birmingham is failing to implement Ordinance No. 16-28. *Id.* at 21; *see also id.* at 19–20. We'll consider these theories in turn.

**1**

Plaintiffs first assert that their injuries were caused by the Attorney General's failure to discharge what they call his "statutory duty" to notify the Legislature and the Governor—before the fact—that the then-contemplated Act No. 2016-18 was unconstitutional. "Quite the contrary," plaintiffs contend, prior to the Act's passage "the Attorney General issued a press release suggesting to Birmingham employers that they likely would not have to comply with the City's minimum-wage law because he anticipated and supported the State Legislature's preemption of the Ordinance." Br. of Appellants at 20; *see also id*. at 8.

Two problems. As an initial matter, plaintiffs' position rests on a material mischaracterization of the Attorney General's press release. The release didn't say

14

(or even imply) that Birmingham employers "would not have to comply" with the City's minimum-wage ordinance. Just the opposite, in fact. The release, quoted in full above, stated—in no uncertain terms, and twice for emphasis—that employers would "have a reasonable time to prepare *to comply*." As any fair reading of the press release reveals, the Attorney General's aim was simply to calm the fears of panicked business owners, who were faced not only with the prospect of having to comply with a patchwork of different minimum-wage requirements across the state but also with an overnight 39% jump in minimum-wage costs in Alabama's largest city—all backed by a threat of fines and penalties for noncompliance. Against that backdrop, the Attorney General's message—that employers would have a reasonable time "to comply" with Birmingham's ordinance, and not, as plaintiffs misstate, that they wouldn't have to comply—was both commonsensical and benign.[5]

Moreover, and in any event, plaintiffs' *ex ante* traceability theory fails because the Alabama Attorney General had no affirmative legal "duty," as plaintiffs describe it, to "inform the Legislature and Governor that Act 2016-18

---

[5] Plaintiffs likewise over-interpret the Attorney General's press release as announcing that he "expected the Legislature to soon invalidate Birmingham's minimum-wage law such that Birmingham employers would not need to raise their wages." Br. of Appellants at 8. Again, the release just didn't say that. The closest it came—not very close, it seems to us—is its statement that "the Alabama Legislature is currently addressing this issue and I expect it will be resolved shortly without adversely affecting the citizens of Birmingham."

15

[was] unlawful." Br. of Appellants at 20. In an effort to support their duty-to-inform argument, plaintiffs point to four provisions of the Alabama Code—none of which actually imposes the obligation they describe. Alabama Code § 36-15-1(1)(a), for instance, requires the Attorney General to give his opinion on questions of law connected with interests of the state, but only when "required by" a list of state officials, and even then only "when it is made, by law, his or her duty so to do." Plaintiffs have made no effort to demonstrate that either prerequisite was satisfied here. Similarly, § 36-15-1(1)(b) requires the Attorney General to provide his opinion on legal questions concerning the duties of certain specified county and city officers "when requested so to do in writing." Again, plaintiffs don't contend here that any of the listed officials ever made a written request. Plaintiffs next point to § 36-15-1(7)—which states that "[a]t such time as [he] deems appropriate, the Attorney General may" examine statutes enacted by the Alabama Legislature for "clarity and constitutional validity." But while § 36-15-1(7) *authorizes* the Attorney General to review existing statutes, it doesn't *require* him to do so—or to do anything, for that matter. Finally, § 36-15-1(8) uses similar terms to give the Attorney General discretion to provide an opinion—to certain specified state officials—about Alabama laws that "have been held invalid by courts of last resort

16

. . . ."  Not only is § 36-15-1(8) purely discretionary, it also applies only to laws that have already been invalidated in court—a precondition not met here.[6]

So plaintiffs' *ex ante* theory of Article III traceability fails on two accounts—both because the Alabama Attorney General has no legal duty to inform anyone of anything under these circumstances and because the particular conduct that plaintiffs contend violated this nonexistent duty simply didn't occur as they have described it.

**2**

What, then, of plaintiffs' *ex post* theory—that the Attorney General's "conduct" in connection with the enforcement of the Act is preventing Birmingham from implementing Ordinance No. 16-28?  We must reject it, as well.

For starters, no one contends that the Attorney General is actually, affirmatively "enforcing" Act No. 2016-18—at least in the usual sense, say, of bringing suit to implement its provisions.  Nor has he ever done so—or even threatened to do so, for that matter.  Under our precedent, that's a problem.  In *Doe v. Pryor*, for instance, we considered a plaintiff's constitutional challenge to Alabama Code § 13A-6-65(a)(3), which forbade so-called "deviate sexual

---

[6] For its part, the lead dissent refers vaguely to "the broad powers invested in [the Attorney General] by the State of Alabama," but conspicuously doesn't dispute—because it can't—that none of the statutes that plaintiffs invoke create the duty that underlies their *ex ante* traceability theory.  Wilson Dissenting Op. at 43; *see also id*. at 47–48.

17

intercourse," defined to include consensual oral and anal sex.  344 F.3d 1282, 1283 (11th Cir. 2003).  We held that because "[t]he only defendant in th[e] case [was] the Alabama Attorney General" and because "[t]he Attorney General ha[d] taken no action to enforce section 13A-6-65(a)(3) against" the plaintiff, her injuries were "not 'fairly traceable' to the only defendant before the Court."  *Id.* at 1285.

It's true, as plaintiffs here say, that *Doe* isn't quite on point because there, in the wake of the United States Supreme Court's intervening decision in *Lawrence v. Texas*, 539 U.S. 558 (2003), the Attorney General had expressly "concede[d] that section 13A-6-65(a)(3) [was] unconstitutional," thereby eliminating any credible threat of enforcement.  *Doe*, 344 F.3d at 1285.  By contrast, plaintiffs contend that here there is a "specter of enforcement by the Attorney General" that satisfies the traceability requirement—it is enough, they seem to contend, that the Attorney General has the authority to enforce Act No. 2016-18.  Reply Br. of Appellants at 8.  But the "specter" that plaintiffs describe is truly a specter—in the traditional, "vision of the imagination" sense.  *See* Webster's Second New International Dictionary 2416 (1944).[7]

---

[7] Before analyzing the Attorney General's legal authority to "enforce" Act No. 2016-18, we should briefly clear up one factual matter.  When confronted at oral argument with the text of the Attorney General's pre-enactment press release—which, as just explained, belies their contention that the Attorney General had suggested that employers wouldn't have to comply with Birmingham's ordinance—plaintiffs pointed to a later, post-enactment statement, in which they said that he had "opined publicly, through a spokesperson, that 'the Legislature has the authority to preempt local ordinances.'"  Amended Complaint at 7; *see also* Oral Argument at 57:21.  But plaintiffs' reliance on the spokesperson's statement is both misleading and misplaced.  It is

To begin with, the Act itself—at least the portion at issue here—doesn't require (or even contemplate) "enforcement" by anyone, let alone the Attorney General.[8]  Section 2, which prohibits and voids local laws purporting to require the payment of wages higher than those prescribed by state or federal law, governs the relationship between private parties—namely, an employer and its employees.  It provides for no enforcement mechanism whatsoever, and it certainly envisions no role for the Attorney General.  Contrast—at least with respect to enforcement generally—Section 3 of the same Act, which governs labor agreements.  That

---

misleading because, in fact, the quote—which was taken from a local news article—was immediately followed by the important caveat that the spokesperson "was not commenting specifically on the minimum wage bill."  *See* Mike Cason, *Gov. Robert Bentley Signs Bill to Block City Minimum Wages, Voiding Birmingham Ordinance*, AL.com (Feb. 25, 2016), https://www.al.com/news/2016/02/bill_to_block_city_minimum_wag_2.html.  The lead dissent complains that in providing the context from which plaintiffs excerpted their partial quotation of the spokesperson, we are impermissibly "rel[ying] on an extra-complaint local news article." Wilson Dissenting Op. at 50.  But as the dissent itself recognizes, when a complaint quotes part of a document—as plaintiffs' complaint does, for instance, in quoting the Attorney General's press release on which the dissent so heavily relies, *see* Amended Complaint at 7—the full text is "incorporated into the amended complaint by reference" and is thus properly considered in deciding a Rule 12 motion.  Wilson Dissenting Op. at 45 n.3.  The same principle justifies consideration of the balance of the spokesperson's statement, which plaintiffs' complaint likewise selectively quotes.  *See* Amended Complaint at 7.  In any event, surely neither plaintiffs nor the dissent can expect to recite the snippet of the spokesperson's statement that they think suits their interests and then complain when the surrounding context is brought to light.

Moreover, plaintiffs' focus on the spokesperson's statement is misplaced because broadly commenting on the Alabama Legislature's general authority to preempt local ordinances under Alabama's version of the Supremacy Clause, *see* Ala. Const. art. IV, § 89—a power that is routinely exercised to enact general preemption laws about all sorts of issues, from the licensure of barbers to the taxation of aviation fuel—says nothing about the all-important question whether the Attorney General himself intends to institute enforcement proceedings.

[8] About this much, at least, all seem to agree.  *See* Wilson Dissenting Op. at 56 (noting that "there is no enforcement mechanism provided at all" in the pertinent provision of Act No. 2016-18).

19

section includes a provision that expressly authorizes an employee or employer to seek injunctive relief in the Montgomery County Circuit Court.  Ala. Act No. 2016-18 § 3(b)(5).  Section 2 conspicuously contains no such provision.  It doesn't anticipate affirmative enforcement at all; rather, its prohibitions will seemingly arise only—as one might have expected here—in the context of a private suit between an employee and her employer, with the latter deploying Section 2 as an affirmative defense to a claim that it isn't paying the wages prescribed by a preempted local law like Birmingham's ordinance.  The fact that the Act itself doesn't contemplate enforcement by the Attorney General counts heavily against plaintiffs' traceability argument.  *See, e.g.*, *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) ("[T]he causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." (citations omitted)); *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (holding that *Lujan*'s traceability requirement is "entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute").[9]

---

[9] *See also City of Austin v. Paxton*, No. 18-50646, 2019 WL 6520769, at *1, *3, *6–7 (5th Cir. Dec. 4, 2019) (holding that even where "the State [had] concede[d] . . . that the [Texas] Attorney General ha[d] the authority to enforce" a provision of Texas law that voided a local ordinance prohibiting landlords from refusing tenants who wished to pay with federal housing vouchers, the Attorney General was not a proper defendant because the plaintiff City had not demonstrated that the Attorney General was likely to take any affirmative action to enforce the law, and, further, that because "the City fail[ed] to show how the Attorney General's past interventions in suits involving municipal ordinances demonstrate[d] that there [was] 'a significant possibility'

In the absence of any indication that Act No. 2016-18 itself contemplates enforcement by the Attorney General, plaintiffs resort to a host of provisions of the Alabama Code that generally describe the Attorney General's litigating and opinion-giving authority. We have already examined several such provisions—those that empower the Attorney General to examine or give his opinion on legal matters in circumstances not applicable here—and found them wanting. *See supra* at 16–17 and n.6. In connection with what we have called their *ex post* traceability theory, plaintiffs seem to rely most prominently on Alabama Code § 36-15-12, which generally authorizes the Attorney General "to institute and prosecute, in the name of the state, all civil actions and other proceedings necessary to protect the rights and interests of the state." But plaintiffs' reliance on § 36-15-12 proves entirely too much—and thus nothing at all. If that statute's general authorization were sufficient to confer standing to sue the Attorney General for *any* violation of *any* Alabama law that regulates the relationships between private parties—including, as is the case here, a statute that doesn't envision enforcement by anyone, let alone the state—then the Attorney General could be made a proper party defendant under innumerable provisions of the Alabama Code. Indeed, plaintiffs' counsel conceded as much at oral argument, acknowledging that

that the Attorney General w[ould] inflict 'future harm' by acting to enforce" the law in question, it was "unlikely the City had standing").

21

plaintiffs' enforcement-based traceability theory, grounded in § 36-15-12, would "apply to most provisions of Alabama law"—all, he admitted, except for those that expressly vest exclusive enforcement authority in either private parties or another government official. Oral Argument at 3:00.[10]

There is, in point of fact, only one way the Attorney General can find himself in the middle of a suit in which Act No. 2016-18 is implicated: As we have explained, Birmingham's minimum-wage ordinance gives an employee a private right of action for damages against an employer who fails to pay the prescribed $10.10 rate. *See* Ordinance No. 16-28 § 3. An employer sued under the ordinance could—and presumably would—raise compliance with the Act as an affirmative defense to liability. When, in response, our hypothetical employee argued—just as plaintiffs here have argued—that the Act is unconstitutional, the Attorney General could, in his discretion, intervene to defend the Act's validity. *See* Ala. Code § 6-6-227; Ala. R. App. P. 44. None of that happened here, of

_____

[10] The lead dissent likewise doesn't deny that its sweeping reading of § 36-15-12 would allow private plaintiffs to invoke any of countless Alabama statutes as a basis for suing the Attorney General in federal court—including statutes that, like Act No. 2016-18, don't contemplate state enforcement but, rather, merely regulate the everyday relationships between private parties. *See* Wilson Dissenting Op. at 52–53. And to be clear, the dissent's assertion that the Attorney General "has relied on th[e] grant of authority under § 36-15-12 before to sue the City of Birmingham to enforce a state statute"—in particular, the Memorial Preservation Act—proves nothing here. *Id.* at 49, 56. The Memorial Preservation Act differs from Act No. 2016-18 in a dispositive way: it expressly vests the Attorney General with enforcement authority. *See* Ala. Code § 41-9-235(a)(2)d; *see also* William Pryor Concurring Op. at 37–39 (detailing the difference between Act No. 2016-18 and the Memorial Preservation Act).

course—and even if it had, it goes without saying (and the lead dissent does not deny, *see* Wilson Dissenting Op. at 47) that the act of joining another party's lawsuit to defend a statute's constitutionality would be a far cry from instituting a prosecution under—or otherwise affirmatively enforcing—that statute's proscriptions. *See Dig. Recognition*, 803 F.3d at 957–58.

For all of these reasons, we conclude that plaintiffs' *ex post*, enforcement-related traceability theory does not withstand scrutiny.

\* \* \*

Plaintiffs could have sued their employers, who refused to pay the ordinance-prescribed $10.10 wage—and thereby (and perhaps most obviously) caused their injury. For reasons unexplained, they didn't. Plaintiffs instead opted to sue the Alabama Attorney General. But their attempts to connect the Attorney General to their injuries fall short. Because the Attorney General didn't do (or fail to do) anything that contributed to plaintiffs' harm, plaintiffs cannot meet Article III's traceability requirement.

## C

Finally—and for good measure—redressability. We begin with two settled principles. First, in assessing this third component of the standing doctrine, we ask whether a decision in a plaintiff's favor would "significant[ly] increase . . . the likelihood" that she "would obtain relief that directly redresses the injury" that she

23

claims to have suffered. *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010) (citation omitted). Second, "it must be *the effect of the court's judgment on the defendant*"—not an absent third party—"that redresses the plaintiff's injury, whether directly or indirectly." *Dig. Recognition*, 803 F.3d at 958 (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005)). Plaintiffs complain, of course, that their employers aren't paying them the $10.10 required by Birmingham's minimum-wage ordinance, and they contend that their alleged injuries would be redressed by "[t]he relief requested in this case—declaratory relief confirming the unlawfulness of Act 2016-18, as well as injunctive relief directing the Attorney General to give notice to Alabama legislators and the public of the same." Br. of Appellants at 26. With those remedies in place, they say, "the Birmingham Ordinance could then go into effect."[11] *Id*. at 16.

The question for us, therefore, is whether plaintiffs' requested relief—in particular, against the Attorney General—would significantly increase the likelihood that their employers would pay them $10.10 per hour pursuant to the ordinance. We can easily dispatch with the suggestion that plaintiffs' requested

---

[11] We note, parenthetically, the oddity of plaintiffs' requested injunction. It's not at all clear what a public statement from the Attorney General "noti[fying]" the Legislature and the public that the Act had been held unconstitutional would add to the force of a court order invalidating it. The seeming superfluousness of plaintiffs' requested "notice" leaves the impression that their prayer was crafted specifically in an effort to tie the Attorney General to their claim.

24

relief would "directly" redress their injuries. *Nova*, 416 F.3d at 1159. As we have explained, Act No. 2016-18 gives the Attorney General no enforcement role whatsoever. Plaintiffs' immediate gripe is with their employers, who aren't paying the ordinance-prescribed wages. And as already noted, Birmingham's ordinance gives plaintiffs a private right of action against those employers. But as also noted, plaintiffs haven't sued their employers, and (to state the obvious) the relief that plaintiffs request in this action wouldn't constrain those employers, who are "not parties to the suit" and who wouldn't be "obliged"—at least in any binding sense— "to honor an incidental legal determination the suit produced." *Lujan*, 504 U.S. at 569 (plurality opinion) (footnote omitted); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 66 (1997) (stating that nonparties are not bound by a court's judgment). Nor, for that matter, would a federal-court judgment declaring Act No. 2016-18 invalid be binding on Alabama courts—which, presumably, would be tasked with deciding the vast majority of cases brought by employees against their employers under the Birmingham ordinance. *See Doe*, 344 F.3d at 1286 ("The only federal court whose decisions bind state courts is the United States Supreme Court."); *see also ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) ("[S]tate courts . . . possess the authority, absent a provision for exclusive federal jurisdiction, to render binding judicial decisions that rest on their own interpretations of federal law."). All of which is simply to say that we just can't

25

see a reasonable case—even under the relatively squishy significantly-increase-the-likelihood standard—that a judgment against the Attorney General here would "directly" redress plaintiffs' alleged injuries.

What, though, about "indirect[]"—one might say downstream—redress? *Dig. Recognition*, 803 F.3d at 958 (quoting *Nova*, 416 F.3d at 1159). Plaintiffs' core contention seems to be that a federal-court order declaring Act No. 2016-18 unconstitutional—supplemented by an injunction ordering the Attorney General to notify the Legislature and the public that the Act is invalid—would significantly increase the likelihood (1) that the City of Birmingham would enforce its minimum-wage ordinance and (2) that pursuant to the ordinance, Birmingham employers would start paying their employees $10.10 per hour.[12]

We see two problems. First, the baseline assumption underlying plaintiffs' redressability theory—that if they were granted their requested relief "the Birmingham Ordinance could then go into effect"—appears more tenuous now than it once did. It is (at best) unclear whether the City of Birmingham would proceed to enforce its minimum-wage ordinance even if plaintiffs were to prevail

---

[12] Like the injunction that they sought against the Attorney General—directing him to "noti[fy]" the Legislature and the public that Act No. 2016-18 is unlawful, *see supra* at 10—plaintiffs' requested injunction "ordering" the City to enforce its minimum-wage ordinance is, in a word, odd. In the normal course, when a lawsuit results in a determination that a law is valid—or at least not invalid—the reviewing court typically issues an order *permitting* the law to go into effect. Here, by contrast, plaintiffs seek an order requiring—commanding—the City of Birmingham to implement its ordinance.

here. At oral argument, it was pointed out to the City's lawyer that whereas the City's panel-stage brief had expressly urged "revers[al]" of the district court's decision dismissing plaintiffs' action, its en banc brief had "take[n] a neutral position." He explained that the shift resulted from the election of "a new administration"—a new mayor and six (of nine) new city councilpersons. Oral Argument at 22:35. More specifically, when queried in various ways by various members of the Court whether the City would enforce its ordinance if Act No. 2016-18 were invalidated, the City's lawyer couldn't (and to his credit didn't) commit. *See, e.g.*, *id.* at 27:10 ("guess[ing]" that the City would enforce the ordinance); *id*. at 23:03 (expressing ambivalence about enforcement). Finally, when asked point-blank whether "a declaration by a federal court that [Act No. 2016-18] is unconstitutional would"—in the words of the operative legal standard—"significantly increase th[e] likelihood" that Birmingham employers would pay their employees the $10.10 wage required under the ordinance, the City's attorney responded, "I can't say one way or the other." *Id.* at 27:25.[13]

---

[13] The lead dissent is of course free to debate the significance of the City's "change in leadership and position," *see* Wilson Dissenting Op. at 68, but to the extent that the dissent asserts that we are duty-bound to ignore post-filing developments in assessing this case's continuing justiciability, it is mistaken. The Supreme Court has repeatedly held that Article III's case-or-controversy requirement "subsists through all stages of federal judicial proceedings, trial and appellate"—and, accordingly, that "throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990)).

27

Second, and in any event, even if plaintiffs were correct that their requested relief would lead Birmingham to implement Ordinance No. 16-28, we think it somewhat unlikely—and certainly not "significantly" more likely, as the law requires—that it would result in plaintiffs' employers paying them more, at least immediately. As we've already explained, the employers—as non-parties to this litigation—wouldn't be bound by a judgment invalidating Act No. 2016-18. So they would be under no *legal* obligation to roll over and cough up the $10.10. And they would have powerful *practical* incentives not to. For starters, Alabama comprises 67 counties and more than 450 separately incorporated municipalities,[14] and dealing with a hodgepodge of different minimum-wage requirements throughout the state would present employers with (to put it mildly) a logistical challenge. Moreover, a mandatory, across-the-board 39% hike in minimum-wage costs in Alabama's largest city is real money; such a dramatic increase could conceivably cause Birmingham-based employers to take any of a number of steps, from raising consumer prices to laying off employees to shuttering operations entirely—steps that they presumably wouldn't take unless they had to.[15] Relatedly,

---

[14] *See Alabama: 2010 Population and Housing Unit Counts (Report CPH-2-2)*, U.S. Census Bureau, at III-3 (Sept. 2012), https://www.census.gov/prod/cen2010/cph-2-2.pdf.

[15] We're not just speculating; multiple *amici curiae* briefs filed in this case attest to the significant burdens that would be visited on Alabama employers if they were suddenly forced (1) to comply with different minimum-wage requirements around the state and (2) to pay dramatically higher hourly wages. *See* Alabama Retail Association Br. at 5, 16; Restaurant Law Center Br. at 5–12.

28

and potentially magnifying these risks, City employers would find themselves at a distinct disadvantage vis-à-vis competitors in the more than 30 municipalities that surround Birmingham,[16] none of whom would be subject to the wage increase. In short, there are good reasons to believe that Birmingham-based businesses would feel compelled to resist the imposition of the ordinance-mandated rate.[17]

Of course, if their employers persisted in refusing to pay the prescribed $10.10 per hour, plaintiffs could file suit under Ordinance No. 16-28's private right of action. Even then, though, the employers would presumably defend on the ground that Act No. 2016-18 voids the ordinance and absolves them of their obligation to pay the higher rate—and when plaintiffs assailed the Act as unconstitutional (as they have here), their employers would defend it anew. Put simply, we're just not convinced that Birmingham employers would go quietly into the night.[18]

---

[16] *See Local Government*, Jefferson County, Alabama, https://www.jccal.org/Default.asp?ID=748&pg=Local+Government (last visited Sept. 16, 2019) (listing "Jefferson County Municipal Government Web Sites").

[17] In assessing employers' likely response to a mandatory 39% minimum-wage increase, we are not, as the lead dissent seems to suggest, engaging in "extra-complaint" factfinding, let alone ushering in some sort of "ominous future" for standing jurisprudence in this Circuit. *See* Wilson Dissenting Op. at 68. To the contrary, we are taking plaintiffs' facts exactly as they have pleaded them—and then making the practical, predictive judgment that the law requires us to make in determining whether the relief that plaintiffs have sought would "significant[ly] increase . . . the likelihood" that they would actually obtain the increased wages that they desire. *Harrell*, 608 F.3d at 1260 n.7.

[18] To be absolutely clear, this wouldn't be (as plaintiffs say) a matter of Birmingham employers "ignor[ing]" either Birmingham's ordinance or a federal-court order. We do not—and will not—countenance parties thumbing their noses at our decrees, or at the law more generally. But that's

The considerable uncertainty about how a rational Birmingham-based employer would respond to plaintiffs' requested declaration (that Act No. 2016-18 is invalid) and injunction (ordering the Attorney General to tell people about it) tees up *precisely* the problem that the Supreme Court confronted when addressing both causation and redressability in *Lujan*. There, the Court considered a challenge brought by environmental-organization plaintiffs to a regulation narrowly construing a federal statute that required government agencies to consult with the Secretary of the Interior to ensure (among other things) that their construction projects wouldn't unduly jeopardize endangered or threatened species. In particular, the plaintiffs sought (1) a declaration that the regulation—which required agency consultation only for domestic projects—was invalid and (2) an injunction requiring the Secretary to promulgate a new rule that would apply more broadly to foreign projects, as well. *Lujan*, 504 U.S. at 557–59.

In explaining the traceability and redressability aspects of the case, the Supreme Court observed that where, as is perhaps typically the case, "the plaintiff is himself an object of the [regulatory] action (or forgone action) at issue," there is "ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561–62. But

---

just it—because the employers aren't parties to this suit, they wouldn't be bound by any resulting judgment, and because they wouldn't be bound, they would be entitled to contend for their business lives by pursuing every available means of legal recourse.

when, as the Court said was true in the case before it, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*"—there, the funding agencies—"much more is needed" to establish standing. *Id*. at 562. The reason is because "[i]n that circumstance," both the traceability and redressability inquiries "hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id*. In other words, when "[t]he existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of . . . discretion the courts cannot presume either to control or to predict," plaintiffs must demonstrate that "those choices have been or will be made in such a manner as to produce causation and permit redressability of injury." *Id.* (internal quotation marks and citations omitted). In such circumstances, standing "is ordinarily substantially more difficult to establish." *Id.* (internal quotation marks and citations omitted).

In the same way that the plaintiffs in *Lujan* couldn't definitively demonstrate that the individual funding agencies would consult with the Secretary on foreign projects even if a new, broader rule were promulgated—because, as the plurality explained, whether the agencies "were bound by the Secretary's regulation [was] very much an open question," *id*. at 568—plaintiffs here can't demonstrate, at least

31

sufficiently to meet the significantly-increase-the-likelihood standard, that

Birmingham-based employers would immediately start paying $10.10 per hour in

the wake of an order invalidating Act No. 2016-18 and enjoining the Attorney

General to notify others of its demise. *Cf. Franklin v. Massachusetts,* 505 U.S.

788, 825 (1992) (Scalia, J., concurring in part and concurring in the judgment) ("If

courts may simply assume that everyone (including those who are not proper

parties to an action) will honor the legal rationales that underlie their decrees, then

redressability will *always* exist.  Redressability requires that the court be able to

afford relief *through the exercise of its power*, not through the persuasive or even

awe-inspiring effect of the opinion *explaining* the exercise of its power.").[19]

* * *

Bottom line:  Plaintiffs cannot demonstrate that the relief that they seek

would—either directly or indirectly—"significantly increase . . . the likelihood"

that their employers would pay them the $10.10 wage prescribed by the

Birmingham ordinance.  To the contrary, we think it would be impermissibly

---

[19] There is one loose end.  To the extent that footnote dicta in *Doe v. Stincer* can be read to suggest that even where a state attorney general "lacks the necessary enforcement authority to support the grant of injunctive relief enjoining the statute's enforcement," a plaintiff might nonetheless have standing to seek a free-floating "declaratory judgment against the Attorney General holding the . . . statute invalid," 175 F.3d 879, 887 n.6 (11th Cir. 1999), we repudiate it. As explained here, a plaintiff bears the burden of demonstrating that the relief she seeks—against the defendant she has named—will significantly increase the likelihood that the injury she alleges will be redressed.  As also explained, in the circumstances of this case, plaintiffs' requested declaration and injunction against the Attorney General—to say nothing of a naked declaration standing alone—do not meet the significantly-increase-the-likelihood threshold.

"speculative" to conclude that their requested relief would produce that result.

*Lujan*, 504 U.S. at 561 (citation omitted).[20]

---

[20] In his separate dissenting opinion, Judge Jordan contends that we have too narrowly framed plaintiffs' injury—as focusing on the economic harm that they suffered from losing out on a $10.10 hourly wage. Plaintiffs, he says, have also alleged, more abstractly, a denial of "equal treatment under the law," particularly "with respect to their voting rights and participation in the political process." Jordan Dissenting Op. at 72–73. Three responses: *First*, although there are traces of this "equal treatment" allegation in plaintiffs' pleadings, that has never really been the theory on which plaintiffs have proceeded; at least as presented to us, this has always fundamentally been a case about economic injury. *See, e.g.*, *Lewis*, 896 F.3d at 1290 (describing the individual plaintiffs' injury as the denial of "a significant increase in their hourly wage" and stating that the organizational plaintiffs had "diverted resources to counteract the effects" of Act No. 2016-18); Br. of Appellants at 19 (asserting that plaintiffs' "legal entitlement to higher wages" is traceable to "the Attorney General's conduct with respect to the Act"); *id*. at 24 (asserting that Act No. 2016-18 "extinguished an existing legal obligation to pay Plaintiffs higher wages" (emphasis omitted)); *id*. at 24–25 (asserting that "[s]tanding based on economic harm cannot be defeated by the speculative possibility that some third-party may voluntarily choose to make plaintiffs whole").

*Second*, although Judge Jordan says that "everything changes" once plaintiffs' injuries are reconceptualized to include a denial of "equal treatment under the law," *see* Jordan Dissenting Op. at 72, he never explains how or why. For reasons we have explained in detail, because the Attorney General has no authority to enforce Act No. 2016-18, no injury that plaintiffs allege (however characterized) is properly traceable to him, and no injunction running against him can provide them the redress they seek. Notably, while Judge Jordan repeatedly asserts that plaintiffs' equal-treatment injury results from "the Act," he never connects that alleged harm to any conduct of the Attorney General, in particular. *See, e.g.*, *id*. at 72, 73, 74, 75, 76, 77. So as it turns out, plaintiffs' equal-treatment-based standing theory fails for pretty much exactly the same reasons that their wages-based theory fails.

*Finally*: Perhaps recognizing that a reconceptualization of plaintiffs' injuries can't bridge the traceability-and-redressability gap that dooms their standing to sue the Attorney General here—Judge Jordan suggests, by reference to a law review article, that "it may be time to rethink the causation and redressability components of Article III standing." Jordan Dissenting Op. at 82. In so doing, he seems to be indicating a willingness to reduce—specifically, by two-thirds— what the Supreme Court has called the "*irreducible* constitutional minimum of standing." *E.g.*, *Lujan,* 504 U.S. at 560 (emphasis added). We think it sufficient to say that the sort of "rethink[ing]" that Judge Jordan envisions is above our pay grade.

## III

To summarize, we hold that plaintiffs lack Article III standing to bring their equal-protection claim against the Alabama Attorney General because they have failed to establish that their injuries (while real and cognizable) are fairly traceable to the Attorney General's conduct or that those injuries would be redressed by a decision in their favor.  Because we conclude that plaintiffs lack standing, we need not—may not—proceed to consider either whether the Attorney General is a proper defendant under *Ex parte Young* or whether plaintiffs have stated a plausible equal-protection claim on the merits.

**AFFIRMED IN PART AND REMANDED TO THE PANEL.**

34

WILLIAM PRYOR, Circuit Judge, concurring:

I join the majority's opinion in full. I write separately—and with some authority—to respond to the assertion in Judge Wilson's dissent that "the Attorney General can act as a sword to enforce the Minimum Wage Act" and so may be the cause of Marnika Lewis's and Antoin Adams's injuries. Wilson Dissenting Op. at 48. Judge Wilson's dissent rests on a fundamental misunderstanding about Alabama law. Although the Attorney General of Alabama has broad authority to bring civil actions "necessary to protect the rights and interests of the state," Ala. Code § 36-15-12, the Minimum Wage Act is not the kind of law the Attorney General can "enforce" against a municipality or anyone else for that matter. So the alleged prospect of enforcement by the Attorney General cannot be the cause of Lewis's and Adams's injuries for purposes of standing under Article III. U.S. Const. art. III.

To be sure, Lewis and Adams have been injured by their employers' refusal to pay the minimum wage mandated by Birmingham City Ordinance No. 15-124. But the majority opinion correctly explains that this economic injury is not fairly traceable to the Attorney General because Alabama's Minimum Wage Act, which preempts the Ordinance, operates entirely of its own force to relieve Birmingham employers of their obligations under the Ordinance. Majority Op. at 19–23. As the majority opinion observes, the Act provides no mechanism for enforcement by the

35

Attorney General whatsoever. *Id.* at 19. Instead, the Act forbids political subdivisions to impose any wage mandate "that is not required by state or federal law," declares any such mandates "void," and "preempts the entire field of regulation in this state touching in any way upon . . . wages." Ala. Code §§ 25-7-41(b), (c), 25-7-45(b).

The absence of an enforcement mechanism is unsurprising in preemption laws that do not "regulate conduct directly" but instead make clear that political subdivisions "may *not* regulate certain areas of conduct (or at least may not do so in particular ways)." Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 261 (2000). Because this kind of preemption law—"the sort typically associated with 'field' preemption," *id.*—does not regulate primary conduct, it makes little sense to speak of "enforcing" such a law. The only actors that "enforce" these laws are courts, and they do so only when performing their judicial duty of choosing between applying a local ordinance and giving effect to a higher state law depriving the ordinance of authority. *See id.* at 261–62; *see generally* Philip Hamburger, *Law and Judicial Duty* (2008). When courts perform that duty, the Constitution of Alabama obliges them to resolve the conflict in favor of the higher state law. Ala. Const. art. IV, § 89. Because the Act preempts the field of wage regulation in Alabama but does not regulate primary conduct, it is not the kind of law the Attorney General can

36

enforce by "prosecut[ing], in the name of the state, [a] civil action[]." Ala. Code § 36-15-12.

Relying on section 36-15-12, Judge Wilson's dissent insists that "the Attorney General *does* have the legal authority to enforce the Minimum Wage Act against the City of Birmingham." Wilson Dissenting Op. at 54. It explains that "the Attorney General recently—and successfully—sued the City of Birmingham under its general enforcement authority in § 36-15-12 to enforce an Alabama state law— the Memorial Preservation Act." *Id.* at 49. But that enforcement action says nothing about the Attorney General's ability to enforce the field-preemption provisions of the Minimum Wage Act.

Unlike the Minimum Wage Act, the Memorial Preservation Act is not a field-preemption law; instead, it regulates primary conduct. It forbids the removal or renaming of certain "architecturally significant . . . monument[s]" on public property without permission from the Committee on Alabama Monument Protection. Ala. Code §§ 41-9-232, 41-9-235. And it expressly provides for enforcement by the Attorney General: "If the Attorney General determines that an entity exercising control of public property" has violated the Act, "the entity shall be fined twenty-five thousand dollars . . . for each violation." *Id.* § 41-9-235(a)(2)d. Because the Memorial Preservation Act regulates primary conduct and empowers the Attorney General to fine violators, it makes perfect sense that he can

37

enforce the Act by prosecuting a civil action under section 36-15-12 "to protect the rights and interests of the state." *Id.* § 36-15-12. But so far as I am aware, there is no authority in Alabama law for the proposition that the Attorney General may sue to enforce a field-preemption law.

In short, there is no prospect that the Attorney General will enforce the Minimum Wage Act against the City of Birmingham. Where the Attorney General has neither "taken . . . action to enforce" nor "threatened to enforce" a state law against a plaintiff, we have held that any injury from the law is not fairly traceable to the Attorney General. *Doe v. Pryor*, 344 F.3d 1282, 1285 (11th Cir. 2003). To be sure, the Attorney General in *Doe* also conceded that the criminal law at issue, which forbade "deviate sexual intercourse," was unconstitutional based on *Lawrence v. Texas*, 539 U.S. 558 (2003). *Id.* at 1283, 1285. That concession further eliminated any credible threat of enforcement by the Attorney General. *Id.* at 1285. Although the reason for the Attorney General's nonenforcement of the Act is different from the reason for not enforcing the criminal law in *Doe*, the fact remains that there is no prospect of his enforcement of the Act. And that fact defeats the traceability requirement of standing.

When one understands the difference between state laws regulating primary conduct and state laws preempting fields of local regulation, the error of Judge Wilson's dissent becomes clear. Because the Minimum Wage Act is a field-

38

preemption law, it is not plausible that the Attorney General could "act as a sword to enforce" the Act against Birmingham. Wilson Dissenting Op. at 48. So the alleged prospect of enforcement cannot establish the causal connection between the Attorney General and Lewis's and Adams's injuries that Article III requires.

WILSON, Circuit Judge, joined by MARTIN, JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges, dissenting:

The key controversy raised by this case is whether the Alabama Minimum Wage Act was passed with the purpose and effect of depriving Birmingham's black citizens of equal economic opportunities—entitlement to a higher wage—on the basis of race. But the majority, on en banc review, sidesteps this issue. The majority deprives these plaintiffs of their day in federal court by chalking this up as simply a case of "wrong defendant." What is wrong is that the majority stiffens the requirements for standing on a *facial* attack at the *motion to dismiss* phase, avoiding reaching the merits. Neither our Constitution nor the Supreme Court requires as onerous a standard as the majority applies at this stage in the proceedings.

Marnika Lewis and Antoin Adams have alleged enough facts in their pleadings to establish all three prongs of Article III standing. As minimum wage workers in Birmingham, they have indisputably shown economic injury. They have also shown that this injury is traceable to Alabama's Attorney General and redressable by this Court.

## I.

We review de novo a district court's decision to grant a motion to dismiss for lack of standing. *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (per curiam). Standing "must be

40

addressed prior to and independent of the merits of a party's claims." *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279 (11th Cir. 2017).

"We need not mince words when we say that the concept of 'Art. III standing' has not been defined with complete consistency in all of the various cases decided by [the Supreme Court] which have discussed it," but there are several axiomatic concepts. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982). "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Every plaintiff must allege facts to establish all three elements that make up "the irreducible constitutional minimum of standing": injury in fact, traceability, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And each of the three elements is "an indispensable part of the plaintiff's case" that "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

In moving to dismiss for lack of standing, a defendant may challenge the complaint facially or factually. *Stalley*, 524 F.3d at 1232. A facial attack requires the court to determine, based only on the pleadings, whether the plaintiff sufficiently alleged a basis of subject matter jurisdiction. *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335–36 (11th Cir. 2013); *Lawrence v.*

41

*Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (per curiam); *Williamson v. Tucker*, 645 F.2d 404, 412–14 (5th Cir. 1981), *cert. denied*, 454 U.S. 897 (1981).[1]  By contrast, a factual attack permits the court to consider extrinsic evidence.  *See Carmichael v. Kellogg, Brown & Root Srvs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009), *cert. denied*, 561 U.S. 1025 (2010).

When considering a facial attack on standing, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *See Warth*, 422 U.S. at 501.  As the plaintiff's burden at the pleading stage is "relatively modest," *Bennett v. Spear*, 520 U.S. 154, 170–71 (1997), "it may be sufficient to provide general factual allegations of injury resulting from the defendant's conduct," *Worthy v. City of Phenix City*, 930 F.3d 1206, 1214 (11th Cir. 2019) (internal quotation mark omitted).  And "at this stage, when there are two equally plausible ways to read a complaint, we should adopt the reading that is most favorable to [the plaintiff]."  *Id.*

I agree with the majority that the injury prong is met here.  But because the majority applied too strict a standard when evaluating traceability and

---

[1] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that all decisions of the "former Fifth" Circuit handed down prior to September 30, 1981 are binding precedent in the Eleventh Circuit).

redressability at the pleading phase, I find it necessary to clarify the appropriate analysis of those elements.[2]

## A. Traceability

In addition to identifying a cognizable harm, a plaintiff must show that her injury is "fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (alteration accepted) (ellipsis omitted). Here, the plaintiffs have sufficiently alleged their injuries are fairly traceable to the Alabama Attorney General by suggesting that he can act as both a sword and a shield to prevent the plaintiffs from receiving the higher wage required by City of Birmingham Ordinance No. 16-28 (the Ordinance). In holding otherwise, the majority improperly rebuts the plaintiffs' factual allegations and refuses to draw reasonable inferences in their favor as required in a facial attack on standing. Further, the majority takes a position on the Attorney General's authority that is contrary to Alabama state law. I would hold that, given the effect his conduct has had on the City of Birmingham and its employers, the broad powers invested in him by the State of Alabama, and the fact that he injected himself into this controversy, the plaintiffs have sufficiently alleged standing. And because standing is jurisdictional, and federal courts have a "virtually unflagging obligation . . . to

---

[2] A detailed account of the facts can be found in the now-vacated panel opinion. *See Lewis v. Governor of Ala.*, 896 F.3d 1282, 1287–89 (11th Cir. 2018), *vacated and reh'g en banc granted by* 914 F.3d 1291 (11th Cir. 2019).

43

exercise the jurisdiction given them," *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), we have a constitutional duty to respect the plaintiffs' standing and evaluate the motion to dismiss on the merits.

1.

Traceability is essentially a "causal connection between the injury and the conduct complained of." *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) (quoting *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1241 (11th Cir. 2003)).  It is "concerned with something less than the concept of proximate cause," so indirect injury is sufficient as long as it "is indeed fairly traceable to the defendant's acts or omissions." *Id.* (internal quotation mark omitted) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260–61 (1977)).

Although a plaintiff lacks standing if her injury is "the result of the independent action of some third party not before the court[,] . . . standing is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties." *Loggerhead Turtle v. Cty. Council of Volusia Cty.*, 148 F.3d 1231, 1247 (11th Cir. 1998), *cert. denied*, 526 U.S. 1081 (1999); *see also, e.g.*, *Inv. Co. Inst. v. Camp*, 401 U.S. 617, 619 (1971).  Further, in a suit seeking to declare a state statute unconstitutional and enjoin its enforcement, the state official sued must "have some connection with enforcement of the provision at issue" to be

44

an appropriate defendant for standing purposes.  *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998).

2.

Accepting the plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the plaintiffs have sufficiently alleged that their injuries are fairly traceable to the Attorney General, who can act as both a *sword* and a *shield* to prevent the plaintiffs from receiving the increased hourly wage required by the Ordinance.

First, the plaintiffs paint a picture of the Attorney General acting as a shield to prevent employers from having to comply with the Ordinance.  After the Birmingham City Council passed the Ordinance on February 23, 2016, the Attorney General issued a press release the same day expressing his opinion that the Ordinance "could greatly disrupt the Birmingham economy," and explaining that he was issuing the release "to prevent that disruption."[3]  The Attorney General

---

[3] Here is the Attorney General's press release in full:

> My office has been contacted by local businesses and officials concerned about the impact of the City of Birmingham's ordinance establishing a city-wide minimum wage of $10.10 per hour, which purports to be effective on February 24.  The ordinance could impose fines and penalties on local businesses who do not comply.  Because this ordinance does not provide a reasonable time for employers to prepare to comply with the new minimum wage, it could greatly disrupt the Birmingham economy.
>
> I am issuing this statement to prevent that disruption and to assure Birmingham businesses that, despite the terms of the ordinance, they

45

also sought to assure businesses that they need not comply with the Ordinance, which would require them to immediately begin paying a minimum wage of $10.10 per hour, because "[u]nder Alabama law, the ordinance cannot take effect immediately." Therefore, "despite the terms of the [O]rdinance," Birmingham businesses would "have a reasonable time to prepare to comply." *See* Doc. ¶ 13.

The Attorney General also declared that help was on the way: "[T]he Alabama Legislature is currently addressing this issue and I expect it will be resolved shortly without adversely affecting the citizens of Birmingham." *See id.* Moreover, a spokesperson for the Attorney General stated that "the Legislature has the authority to preempt local ordinances, even those that are already in effect." *See id.* ¶ 14.

---

will have a reasonable time to prepare to comply. Under Alabama law, the ordinance cannot take effect immediately. The City of Birmingham cannot impose an unreasonable restriction on the conduct of business by mandating an immediate increase in the minimum wage without providing a reasonable period of time to comply.

The Alabama Legislature is currently addressing this issue and I expect it will be resolved shortly without adversely affecting the citizens of Birmingham.

Attorney General Statement on Enforceability of Birmingham Minimum Wage Ordinance (Feb. 23, 2016), https://www.alabamaag.gov/documents/news/780.pdf. We may consider the full text of the press release because it was incorporated into the amended complaint by reference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

46

These are not uncertain terms. The Attorney General clearly instructed Birmingham businesses that they need not comply with the Ordinance even though it would require an immediate increase in wages. The Attorney General cited no provision of Alabama law supporting his assertion that the Ordinance could not take effect immediately—rather, he relied on the weight of his position's authority alone to assure businesses that they could *willfully ignore* the Ordinance.

More importantly, given that the Attorney General injected himself into the minimum wage issue through his public statements, a reasonable inference can be drawn—and, in fact, must be drawn given that we are considering a facial attack on standing at the motion to dismiss stage—that he would likely intervene to defend the Minimum Wage Act's validity if its constitutionality was challenged in state court. *See* Ala. Code §§ 6-6-227 (entitling the Attorney General to be heard in all cases challenging the constitutionality of a statute, ordinance, or franchise), 36-15-1(2) (requiring the Attorney General to "attend to all cases other than criminal that may be pending in the courts of this state, in which the state may be in any manner concerned"); Ala. R. App. P. 44 (requiring parties to serve the attorney general with any appellate brief challenging the validity of a statute if the attorney general is not a party to the proceeding). This is especially true given that the Alabama Code clearly identifies the Attorney General as an authority on the constitutionality of state laws. Indeed, the Attorney General "may carefully

47

examine all of the general statutes now in force, or which hereafter may be enacted by the Legislature from time to time, as to their clarity and constitutional validity," Ala. Code § 36-15-1(7), and then may make a written report to the governor and judiciary committees of the state legislature to point out invalid laws "and also mak[e] suggestions as to inaccuracies, inadvertences, mistakes, and omissions in statutes, which, in his or her opinion, should be corrected," *id.* at § 36-15-1(8). He presumably saw no need to write any such report here. Therefore, taking the Attorney General's assurance to employers that they need not comply with the Ordinance with his likely defense of the Minimum Wage Act's constitutionality, the Attorney General lent the weight of his office—including his air of authority on the constitutionality of state laws—to the employers, justifying their decision not to increase the plaintiffs' wages.

And second, the plaintiffs indicate that the Attorney General can act as a sword to enforce the Minimum Wage Act. Alabama law gives the Attorney General broad authority "to institute and prosecute, in the name of the state, *all civil actions* and other proceedings necessary to protect the rights and interests of the state." Ala. Code § 36-15-12 (emphasis added); *see also* Doc. 18 ¶ 12. So a reasonable inference can be drawn from plaintiffs' allegations that the City of Birmingham has not taken steps to enforce the Ordinance for fear that the Attorney General will enforce the Minimum Wage Act against it. Once again, we must

48

draw this reasonable inference when evaluating plaintiffs' standing allegations.

And in fact, the Attorney General recently—and successfully—sued the City of

Birmingham under its general enforcement authority in § 36-15-12 to enforce an

Alabama state law—the Memorial Preservation Act.[4]  *See* Compl. at 1–2, *Alabama*

*ex rel. Att'y Gen. Steve Marshall v. City of Birmingham*, No. 01-CV-2017-

903426.00 (Jefferson Cty. Cir. Ct. Aug. 16, 2017);[5] *see also Alabama*, slip op. at

43–44.  It is thus reasonable to infer from the plaintiffs' allegations that there is a

causal connection between the Attorney General's sword-and-shield conduct and

the plaintiffs not receiving their increased hourly wage.

3.

The majority claims, however, that the plaintiffs' injury is not fairly

traceable to the Attorney General.  First, the majority asserts that the Attorney

---

[4] The Memorial Preservation Act of 2017 requires local governments to receive permission before removing or renaming historically significant buildings and monuments that are at least 40 years old.  *See* Ala. Code §§ 41-9-232, 41-9-235.  The Southern Poverty Law Center has described the Act as a means to prevent the removal of Confederate monuments.  *See* Rhonda Brownstein, *SPLC: Alabama's Memorial Preservation Act is About Protecting Confederate Monuments*, Southern Poverty Law Center (May 25, 2017), https://www.splcenter.org/news/2017/05/25/splc-alabamas-memorial-preservation-act-about-protecting-confederate-monuments.  Earlier this year, an Alabama circuit court judge declared the Act unconstitutional, but the Supreme Court of Alabama recently reversed and remanded to the circuit court to declare the City's actions violative of the Act and impose a $25,000 fine.  *See Alabama v. City of Birmingham*, __ So. 3d __, No. 1180342, slip op. at 43–44 (Ala. Nov. 27, 2019); Order on Cross Mots. for Summ. J., *Alabama ex rel. Att'y Gen. Steve Marshall v. City of Birmingham*, No. 01-CV-2017-903426.00 (Jefferson Cty. Cir. Ct. Jan. 14, 2019).

[5] We may take judicial notice of court documents from a state proceeding.  *Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013)

General had no duty to inform anyone of the Minimum Wage Act's unconstitutionality—the majority's "*ex ante*" characterization.  Second, the majority claims that Attorney General's alleged conduct in connection with enforcement of the Minimum Wage Act is not preventing the City of Birmingham from enforcing the Ordinance—the majority's "*ex post*" characterization.  But this analysis is problematic for several reasons.

To start, while purportedly granting "an appropriately charitable reading" to the plaintiffs' pleadings and briefs, the majority refuses to accept the plaintiffs' allegations of fact as true or draw reasonable inferences in their favor as required at this stage.  For example, the majority disputes the plaintiffs' allegations regarding the Attorney General's press release.  Rather than draw reasonable inferences in favor of the plaintiffs, the majority claims that the plaintiffs materially mischaracterized the Attorney General's press release and offers its own, contradictory interpretation of the press release.  The majority also relies on an extra-complaint local news article to refute the context in which the Attorney General asserted that the Legislature could pass statutes to preempt local ordinances.

But these bones should not be picked at this stage.  *See Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1289 n.10 (11th Cir. 2010) ("This material, however, is neither part of the pleadings, nor subject to judicial notice, nor

included in any affidavits or attachments to the pleadings, so we do not consider it in resolving this facial attack on subject-matter jurisdiction."). As explained above, the press release clearly indicated that employers need not comply with the Ordinance on its purportedly effective date of February 24, 2016, because it did not give them reasonable time to comply. It also suggested the employers may never need to comply because the Alabama Legislature was contemporaneously addressing the issue. And the majority's reliance on the local news article was wholly inappropriate given that the Attorney General's motion to dismiss was a facial rather than a factual attack on standing.[6] Therefore, had the majority applied the appropriate standards for this stage of the proceedings, it would have accepted the reasonable inference that the Birmingham employers did not increase the plaintiffs' wages because of the Attorney General's influential effect on them.

---

[6] The majority implies that I am having my cake and eating it too by incorporating by reference the Attorney General's press release while admonishing the majority's reliance on a local news article. But not all extra-complaint references are created equal. The source and content of the Attorney General's press release are undisputed, and thus the plaintiffs incorporate by reference the whole text of the press release by quoting portions of it in the Amended Complaint. And to be clear, the content of the Attorney General spokesperson's statement is also undisputed—the plaintiffs' quoted statement matches identically the news article's quoted statement. But the context for the spokesperson's quote is disputed because the *source* of the claim that the Attorney General's statement was not regarding the Minimum Wage Act was *the local news journalist*, not the Attorney General.

In other words, the news article provides a single journalist's characterization of the context for the spokesperson's statement. The article cannot serve as a definitive authority on the context for the spokesperson's statement, and there is nothing in the Amended Complaint to suggest it was the plaintiffs' source for the statement. Therefore, it is not entitled to judicial notice or incorporation by reference, nor does it obviate our duty to accept the plaintiffs' facts as true and construe the Amended Complaint in their favor at this stage. *See Warth*, 422 U.S. at 501; *Mulhall*, 618 F.3d at 1289 n.10.

51

Furthermore, the majority takes a position on the Attorney General's authority to enforce the Minimum Wage Act that is contrary to Alabama state law. The majority's analysis attacks the plaintiffs' allegations about the Attorney General's authority to enforce the Minimum Wage Act, rejecting every statute referenced by the plaintiffs and hanging its hat on "[t]he fact that the Act itself doesn't contemplate enforcement by the Attorney General." The majority claims there is only one way for the Attorney General to find himself in a suit implicating the Ordinance: by exercising his discretion to intervene and defend the Minimum Wage Act's validity in a private cause of action brought by an employee against her employer under the Ordinance.

Implicit in that assertion is the legal conclusion that the Attorney General does not have the authority to enforce the Minimum Wage Act against the City of Birmingham. In other words, the majority tacitly takes a position on the Attorney General's authority that is contrary to the plain text of § 36-15-12's broad grant of power, contrary to the Alabama Supreme Court's interpretation of that power, and contrary to the Attorney General's history of wielding that power. *See* § 36-15-12 ("The Attorney General is authorized to institute and prosecute, in the name of the state, *all civil actions* and other proceedings necessary to protect the rights and interests of the state." (emphasis added)); *see also, e.g.*, *State ex rel. Carmichael v. Jones*, 41 So. 2d 280, 283–84 (Ala. 1949) (acknowledging "the broad powers

52

vested in the attorney general both by common law and under various statutes" and referring to the Attorney General as "the chief law officer of the state"). This is a means necessary to achieve the majority's desired end that the plaintiffs' injury is not fairly traceable to the Attorney General's enforcement-related conduct.

In his concurrence, Judge Pryor writes "with some authority" as a former Alabama Attorney General that "the Minimum Wage Act is not the kind of law the Attorney General can 'enforce' against a municipality or anyone else for that matter." In so doing, he draws a line between field-preemption laws and primary-conduct laws, concluding that the Attorney General cannot enforce the former under § 36-15-12. But Judge Pryor cites zero precedent supporting his hypothesis that § 36-15-12 only authorizes enforcement of primary-conduct laws,[7] and the statute itself imposes no such limitation. And in any event, the distinction is one without a difference. A "field-preemption" statute like the Minimum Wage Act *does* regulate conduct by effectively prohibiting local governments from regulating within a particular field—here, the appropriate minimum wage. Further, Judge Pryor's groundless and convenient narrowing of § 36-15-12's scope flouts the Supreme Court of Alabama's view that the "express statutory authority of the Attorney General to institute and prosecute suits" carries with it "the implied

---

[7] Judge Pryor relies on only a sentence from an 81-page law review article and a book to support this interpretation of § 36-15-12, neither of which support his proposition that field-preemption laws are not the type of laws that can be enforced by a state's chief legal officer.

53

authority to do *all things* necessary and proper to their final conclusion."
*McDowell v. State*, 243 Ala. 87, 89 (Ala. 1942) (emphasis added).

Simply put, the Attorney General *does* have the legal authority to enforce the Minimum Wage Act against the City of Birmingham, and it can be reasonably inferred from the plaintiffs' complaint that the City of Birmingham has not enforced its Ordinance for fear of such enforcement. *See* Doc. 18 ¶ 16.

The cases the majority cites to support its analysis are not persuasive. The majority claims that under *Doe v. Pryor*, 344 F.3d 1282 (11th Cir. 2003), it is a "problem" that the Attorney General has not brought a suit or threatened to bring a suit to implement the Minimum Wage Act's provisions. But this overstates the standard for determining traceability. For the Attorney General to be an appropriate defendant for standing purposes, he need only "have some connection with enforcement of the provision at issue." *See Socialist Workers Party*, 145 F.3d at 1248.

And as the majority notes, there was no credible threat of enforcement in *Doe* because the Attorney General had conceded the statute at issue was unconstitutional. That is not the case here. The Attorney General informed employers about the Minimum Wage Act before it was even passed, and he subsequently confirmed through a spokesperson that the Alabama Legislature could preempt local ordinances. Therefore, it is not merely a "vision of the

54

imagination" that the Attorney General would enforce the Minimum Wage Act; the Attorney General specifically injected himself into the minimum wage power struggle between the City of Birmingham and the State and made clear that he backs the State's horse. Because of this intentional involvement by the Attorney General, we can reasonably infer that the plaintiffs' injury is fairly traceable to him—the employers have not paid the higher wage because of the shield the Attorney General provides as a defender of the Minimum Wage Act, and the City of Birmingham has not enforced the Ordinance because of the sword the Attorney General could wield to compel the City's compliance with the Minimum Wage Act.

The majority also relies on *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952 (8th Cir. 2015), and *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc), to say that "[t]he fact that the [Minimum Wage Act] itself doesn't contemplate enforcement by the Attorney General counts heavily against plaintiffs' traceability argument." In both of those cases, however, the statutes at issue provided for enforcement through private civil actions for damages. In other words, the statutes specifically provided enforcement schemes, but left the Attorney General out of them. Those plaintiffs' injuries were thus fairly traceable *only* to private civil litigants who could seek damages under the statute. And in both cases, there was no conduct on the part of the defendant state officials to

55

speak of—they were sued so the plaintiff parties could put a name on the other side

of the "v" when seeking the court's determination on the constitutionality of a

statute.

Here, there is no private cause of action under the Minimum Wage Act;

there is no enforcement mechanism provided at all. But as discussed above,

§ 36-15-12 confers broad authority to the Attorney General to institute actions,

including one against the City of Birmingham to enforce the Minimum Wage Act.

The Attorney General has relied on this grant of authority under § 36-15-12 before

to sue the City of Birmingham to enforce a state statute. Further, the Attorney

General is not merely a passive party here, sued to manufacture a case challenging

the Minimum Wage Act. Rather, the Attorney General's conduct injected him into

this controversy, thus opening him up to this suit.

The fact that the plaintiffs could have alternatively sued their employers is

neither here nor there. I would hold that the plaintiffs have sufficiently established

that their injuries are fairly traceable to the Attorney General's conduct.

### B. Redressability

Finally, a plaintiff must show that her harm is redressable. *Lujan*, 504 U.S.

at 561. Notwithstanding the majority's stiffened redressability standard, Supreme

Court jurisprudence supports that the plaintiffs' injury is redressable because the

practical consequence of a court order stripping the Attorney General of his sword

56

and shield is a significant increase in the likelihood that the plaintiffs receive the higher hourly wage.  The majority's reliance on mischaracterized, extra-complaint facts to hold otherwise is entirely improper in a facial attack on standing.

1.

The majority fashions a two-prong test for redressability: first, that a decision in the plaintiff's favor would significantly increase the likelihood that the plaintiff's injury would be directly redressed, and second, that "it must be *the effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly."  The majority's analysis thus evaluates whether granting relief against the Alabama Attorney General would make it significantly more likely that their injuries are "directly" or "indirectly" redressed.  What the majority fails to acknowledge is that this second step is something new—actually, something borrowed from a couple of other circuits— that manufactures a heightened redressability standard neither required by nor supported by the Supreme Court's standing jurisprudence.

The redressability requirement "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."  *Valley Forge Christian College*, 454 U.S. at 472. Accordingly, the Supreme Court consistently focuses on whether there is a

57

"substantial likelihood that the requested relief will remedy the alleged injury in fact." *Sprint Commc'ns Co., L.P. v. APCC Srvs., Inc.*, 554 U.S. 269, 287 (2008) (emphasis omitted); *see also Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). The Court expands on the "substantial likelihood" concept by telling us that redress must be "likely, as opposed to merely speculative." *Friends of the Earth, Inc. v. Laidlaw Envtl. Srvs. (TOC), Inc.*, 528 U.S. 167, 181, 187 (2000); *Lujan*, 504 U.S. at 561. As our own circuit has recently confirmed, "a plaintiff *need not demonstrate anything more* than a substantial likelihood of redressability." *Wilding v. DNC Srvs. Corp.*, 941 F.3d 1116, 1126–27 (11th Cir. 2019) (emphasis added) (internal ellipsis and quotation marks omitted).

To be sure, standing is more difficult to establish when the plaintiff herself is not the object of the government conduct she challenges, *see Lujan*, 504 U.S. at 562, and this comes as no surprise. In cases of direct injury, it is often obvious why redressability exists. But the Supreme Court has repeatedly found redressability where, as here, the object of the government's challenged conduct— i.e., a third party with *discretion* to act—is not before the court. *See, e.g.*, *Inv. Co. Inst.*, 401 U.S. at 619 (recognizing that investment companies had standing to challenge a regulation from the Comptroller of the Currency that permitted—but did not require—third-party banks "to establish and operate collective investment

58

funds"). Therefore, the majority's repeated assertion that there is no redressability merely because the plaintiffs' requested relief would not bind the employers or the Alabama state courts misses the mark. The Court's jurisprudence demonstrates that redressability exists in such circumstances if the plaintiff is significantly more likely to obtain relief from her injury as a practical consequence of a favorable court ruling against the named defendant—even if the ruling does not necessarily bind the discretion-wielding third party.

For example, in *Franklin v. Massachusetts*, 505 U.S. 788 (1992),[8] the State of Massachusetts and two of its registered voters brought an action against the President, the Secretary of Commerce, Census Bureau officials, and the Clerk of the House of Representatives to challenge the reapportionment of the House of Representatives following the 1990 census. Through the process articulated in the federal reapportionment statute, the Secretary of Commerce must take the census and then report the population of each state to the President. *Id.* at 792. After receiving the report, the President transmits to Congress a statement showing the number of persons in each State and the number of Representatives apportioned to each State. *Id.*

The plaintiffs alleged the Secretary erred in deciding to include overseas military personnel in the state population counts for their "home of record" for the

---

[8] *Franklin* was decided two weeks after the Court's decision in *Lujan*.

59

1990 census, resulting in a Representative shifting from Massachusetts to Washington. *Id.* at 790–91. The plaintiffs sought, among other things, a declaration that the decision to allocate military personnel serving overseas to their home States of record was unconstitutional. *Id.* at 795. The Court determined the plaintiffs' injury would likely be redressed through declaratory relief against the Secretary of Commerce. *Id.* at 803. In so holding, the Court noted that the Secretary had an interest in defending her own policy determination regarding the census. *Id.* And even though the Secretary herself could not alter the apportionment, the Court assumed it was "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination." *Id.*

Ten years later, in *Utah v. Evans*, 536 U.S. 452 (2002), the State of Utah brought an action against the Secretary of Commerce and the Acting Director of the Census Bureau, alleging that they violated a federal statute and the Constitution by engaging in improper counting methods and seeking an injunction compelling the census officials to alter the census results. The State of North Carolina intervened, arguing that federal courts lacked jurisdiction to hear the case. *Id.* at 459. The Court found no significant difference between the plaintiff in *Franklin* and the plaintiff there, both of which brought their lawsuits after completion of the

60

census to argue the Census Bureau implemented improper counting methods. *Id.* at 459–61. Further, both reasonably believed that if the Secretary recalculated and recertified the official results of the census, it would likely lead to a new, more favorable apportionment of Representatives. *Id.* at 461.

North Carolina argued that court-ordered relief against the Secretary would not redress Utah's injury because it could not reach the President—who held the responsibility for transmitting the number of Representatives apportioned for each state to Congress—and so the Secretary's report itself could not inherently redress the plaintiffs' injury. *Id.* at 461. But the Court found it "likely that Utah's victory here would bring about the ultimate relief that Utah seeks" because, as in *Franklin*, it was "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision." *Id.* at 463–64. The Court noted that in its standing precedent, "the courts would have ordered a change in a legal status (that of the 'report'), and the practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Id.* at 464; *see also, e.g.*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) (holding plaintiffs had standing to obtain a determination that an organization was a "political committee" because such a holding would make the FEC *more likely* to subject the organization to reporting

61

requirements even though the FEC could lawfully exercise its discretion not to require such reporting); *Bennett*, 520 U.S. at 169–71 (holding that plaintiffs had standing against Fish and Wildlife Service officials to obtain a decision regarding the lawfulness of a biological report that had a coercive but nonbinding effect on the Bureau of Reclamation, which had the "ultimate responsibility" for determining how to move forward on a project that would impact the plaintiffs); *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 757–58, 758 n.16 (10th Cir. 2010) (noting it was "substantially likely" that public employers outside the scope of an injunction "would abide by an authoritative interpretation" of a provision regulating verification of employment eligibility "even though they would not be directly bound by such a determination").

Therefore, the proper question for this redressability analysis is whether a *practical consequence* of a federal court order declaring the Minimum Wage Act unconstitutional and enjoining the Attorney General from enforcing it would be a significant increase in the likelihood that the employers start paying the plaintiffs $10.10 per hour under the Ordinance.[9]  The answer is yes.

---

[9] Although plaintiffs did not specifically request an injunction enjoining the Attorney General from enforcing the Minimum Wage Act, the plaintiffs' amended complaint did request any "such other and further relief as the Court deems equitable and just."  Doc. 18 at 49. Because a judgment enjoining the Attorney General from enforcing the Minimum Wage Act would naturally flow from the plaintiffs' claim that the Minimum Wage Act is unconstitutional, the final judgment in this case could "grant the relief to which [the plaintiffs are] entitled, even if [the plaintiffs have] not demanded that relief in [their] pleadings."  *See* Fed. R. Civ. P. 54(c); *Whole Woman's Health v. Hellerstedt*, 579 U.S. __,136 S. Ct. 2292, 2307 (2016) ("The Federal

2.

A judgment declaring the Minimum Wage Act unconstitutional and enjoining the Attorney General from enforcing it would make it significantly more likely that the plaintiffs receive a higher wage. The plaintiffs allege that the City of Birmingham has not taken steps to enforce the Ordinance. Doc. 18 ¶ 16. And they allege that the Attorney General issued public statements indicating that the Alabama Legislature was addressing the "issue"—i.e. the Ordinance—and that the Legislature has the authority to preempt local ordinances. Doc. 18 at ¶¶ 13–14. Further, the Attorney General recently sued the City of Birmingham to enforce a state statute. *See* Compl. at 1–2, *Alabama ex rel. Att'y Gen. Steve Marshall v. City of Birmingham*, No. 01-CV-2017-903426.00 (Jefferson Cty. Cir. Ct. Aug. 16, 2017). Therefore, it is reasonable to infer that the Minimum Wage Act *and the Attorney General's conduct surrounding the Minimum Wage Act* prevented the City of Birmingham from enforcing its Ordinance and shielded the employers from having to pay the Ordinance's required wage.

Without the looming threat of a suit by the Attorney General to enforce the Minimum Wage Act, it is more than reasonable to infer that the City would begin

Rules of Civil Procedure state that . . . a 'final judgment should grant the relief to which each party is entitled, even if the party had not demanded that relief in its pleadings.' And we have held that, if the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is 'proper.'" (citations omitted)).

enforcing the Ordinance on its books.[10]  And without the Attorney General's

protection, the employers will be forced to reconsider whether they should pay the

Ordinance's required wage or expose themselves to litigation and/or penalties from

employees and the City of Birmingham, regardless of whatever economic,

competitive, or political reasons they may have to dislike the wage increase.  Thus,

given the practical consequences of a local federal court declaring the Minimum

Wage Act unconstitutional[11] and enjoining the Attorney General from enforcing

it—or, in other words, stripping the Attorney General of his sword and his shield—

such an order would significantly increase the likelihood that the plaintiffs receive

the higher wage.  Accordingly, I would hold that the plaintiffs sufficiently

established redressability for this stage in the proceedings.

---

[10] We are not in the business of assuming that a local government will not enforce its own laws, especially those as recent, well-publicized, and fought-for as this Ordinance.

[11] Although this court's declaration would not bind Alabama state courts, we should not ignore the authoritativeness and impact of a federal court's interpretation of federal law—here, the Constitution.  *See Lujan*, 504 U.S. at 585, 595–601 (Stevens, J., concurring) (noting in his redressability analysis that the Court must presume that if it holds a federal statute requires certain behavior, the affected agencies would not ignore that "authoritative construction of the governing statute"); (Blackmun, J., dissenting) ("Emphasizing that none of the action agencies are parties to this suit . . . , the plurality concludes that 'there is no reason they should be obliged to honor an incidental legal determination the suit produced.'  I am not as willing as the plurality is to assume that agencies at least will not try to follow the law." (citations omitted)); *cf. Steffel v.Thompson*, 415 U.S. 452, 484 (1974) (Rehnquist, J., concurring) (noting the possible effects of a federal court's declaration regarding a state statute's unconstitutionality, including that the state may choose not to enforce the statute, the federal plaintiff could "bolster his allegations of unconstitutionality in the state trial with a decision of the federal district court in the immediate locality," and "the state legislature may decide, on the basis of the federal decision, that the statute would be better amended or repealed").

3.

The majority avoids this conclusion by overstating the "considerable uncertainty" about how a "rational Birmingham-based employer would respond" to the plaintiffs' potential forms of relief given the "risks," "logistical challenge[s]," and "significant burdens" of paying the Ordinance's required wage. The majority notes this is especially true given that "[i]t is (at best) unclear whether the City of Birmingham would proceed to enforce its minimum-wage ordinance even if plaintiffs were to prevail here" in light of its neutral position during the en banc phase.

This mischaracterizes the City of Birmingham's position. During oral argument, the City explained that it was taking a neutral position in the case at this stage, and that there had been a change in administration since the inception of the case—six new city councilmembers and a new mayor. When asked if this change meant the City of Birmingham would not seek to enforce its Ordinance, the City clarified that it would *depend on the outcome of this case.* Counsel for the City of Birmingham believed the City "*would* probably enforce" the Ordinance if this court declared the Minimum Wage Act unconstitutional. Further, the City of Birmingham agreed that the existence of the Minimum Wage Act and the Attorney General's position on the preemptive effect of the Minimum Wage Act were the reasons it had not enforced the Ordinance. When I clarified that the relevant

65

question in this case was whether it would significantly increase the likelihood that Birmingham employers pay their employees the $10.10 wage required under the Ordinance if this court declared the Minimum Wage Act unconstitutional, counsel for the City of Birmingham indicated he could not say one way or the other what the employers would do. The majority hangs its hat on this response as if it were some weighty concession that defeats redressability—but the purpose of my statement was to clarify the relevant question for determining redressability, not to illicit a determinative answer from the City. How could *the City of Birmingham* possibly speak to whether *the employers* would start paying the $10.10 wage? The City of Birmingham could only speak to whether it would enforce the Ordinance if this court declared the Minimum Wage Act unconstitutional—and counsel for the City believed that it would.

But even more importantly, it is inappropriate to consider the City's "change in position" between panel briefing and en banc briefing before this court when determining, *based on the pleadings*, whether the plaintiffs have standing to pursue this case. To the extent the majority relies on any extra-complaint facts—including the City of Birmingham's change in leadership and statistics about the relative burdens of paying a higher wage—those facts are irrelevant to a facial attack on standing.

66

The difference between a facial and factual attack on standing is vital here.

The core distinction is what the court may consider in each type of attack:

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion—the court must consider the allegations of the complaint to be true. But when the attack is factual, the trial court may proceed as it never could under 12(b)(6) . . . . Because at issue in a factual 12(b)(1) is the trial court's jurisdiction— its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims.

*Lawrence*, 919 F.2d at 1529 (citations omitted) (quoting *Williamson*, 645 F.2d at 412–13).

Here, the Attorney General made a facial attack on standing, which limits the court's consideration to the pleadings. Yet the majority repeatedly relies on extra-complaint facts. This, as explained above, is not the law. *See, e.g.*, *Houston*, 733 F.3d at 1335–36; *Lawrence*, 919 F.2d at 1529; *Williamson*, 645 F.2d at 412– 14. In fact, only *one* Eleventh Circuit decision suggests that a court can consider extra-complaint facts in a facial attack on standing: *Flat Creek Transp., LLC v. Fed. Motor Carrier Safety Admin.*, 923 F.3d 1295, 1299 n.1 (11th Cir. 2019) (Newsom, J.). But that stray, newly minted decision defies years of binding circuit precedent. Worse yet, the cases on which it relied were discussing factual attacks, not facial attacks, when they explained that a court can weigh extra-complaint facts

67

and evidence when considering its jurisdiction. *See Flat Creek Transp.*, 923 F.3d at 1299 n.1 (citing *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1260–61 (11th Cir. 1997); *Lawrence*, 919 F.2d at 1528–29)).

*Flat Creek Transportation* and the majority here stand to eviscerate the difference between facial and factual attacks on standing. As a result, the district courts following these cases can now kick cases out of court on standing grounds, relying on facts outside the complaint on a defendant's facial attack without giving the plaintiff the opportunity to develop a factual record supporting its standing.

Indeed, that is the effect in this case. The majority rests its redressability analysis in significant part on how it thinks two extra-complaint sets of facts affect the likelihood that the plaintiff will receive the Ordinance's required wage: the City's change in leadership and position, and the employers' "powerful practical incentives" not to "roll over and cough up the $10.10." But given that the Attorney General made a *facial* attack on standing, plaintiffs have not had—nor will they have—the opportunity to develop the factual record to rebut these disputed facts. Therefore, the majority's analysis of these extra-complaint facts and the *Flat Creek Transportation* decision are simply wrong.

*** 

*Flat Creek Transportation* and this appeal portends an ominous future for Eleventh Circuit litigants who bring claims based on remedial legislation or seek to

68

vindicate important constitutional rights. We have erected a formidable barrier to such appeals in the Eleventh Circuit as a result of this developing jurisprudence. *See also, e.g.*, *City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274 (11th Cir. 2019) (per curiam) (dismissing the city's claims of discriminatory and predatory lending practices in violation of the Fair Housing Act on standing grounds without giving the city the opportunity to develop facts to support its standing, in contravention of binding Supreme Court precedent).

Marnika Lewis and Antoin Adams have satisfied their relatively modest burden in pleading that they have suffered an injury fairly traceable to the Attorney General and likely to be redressed by relief that we can provide. They currently receive lower wages as a result of a state law that is enforceable and supported by the Alabama Attorney General. Having alleged enough facts at this stage to establish standing, Lewis and Adams are entitled to an opportunity to argue for relief. The majority instead applies an overly demanding standing analysis at this stage, effectively avoiding the challenge of addressing the merits of this case.

Because I would hold that the plaintiffs have met "the irreducible constitutional minimum of standing" to bring their case against the Attorney General, I would address the Eleventh Amendment and the merits of the plaintiffs' claims. For the reasons discussed in the panel decision, I would hold that the Eleventh Amendment does not immunize the Attorney General from this suit and

69

reverse the district court's dismissal of the plaintiffs' intentional discrimination

claim against him. *See Lewis*, 896 F.3d at 1292, 1294–97, 1299.

JORDAN, Circuit Judge, joined by WILSON, MARTIN, ROSENBAUM, and JILL PRYOR, Circuit Judges, dissenting:

I join Judge Wilson's dissent, which demonstrates that plaintiffs Marnika Lewis and Antoin Adams have Article III standing with respect to their claim seeking an hourly minimum wage of $10.10 pursuant to the Birmingham ordinance. I write separately with some additional observations.

\* \* \* \* \* \* \*

The majority has phrased, and answered, too narrow a question on standing. As a result, it has reached an incorrect and incomplete answer. *Cf.* Alexander Bickel, The Least Dangerous Branch 103 (Bobbs-Merrill Co., Inc. 1962) ("No answer is what the wrong question begets[.]").

The majority examines only whether Ms. Lewis and Mr. Adams have Article III standing based on their status as employees in Birmingham who earn less than the $10.10 minimum hourly wage prescribed by the City's ordinance. After framing the injury of Ms. Lewis and Mr. Adams as not receiving an hourly wage of $10.10, the majority concludes that this injury is not traceable to the Alabama Attorney General or redressable because a favorable decision would not necessarily guarantee them $10.10 per hour.

71

But Ms. Lewis and Mr. Adams are not just claiming entitlement to a higher hourly wage. They are also alleging the denial of equal treatment under the law. When their injuries are properly characterized, everything changes.

In their amended complaint, 14 plaintiffs—Ms. Lewis, Mr. Adams, other African-American registered voters in Birmingham, and several organizations— assert four equal protection claims (Counts II, VI, VIII, and IX). Counts II and VI allege that Alabama's Minimum Wage Act violates the Equal Protection Clause of the Fourteenth Amendment by denying African-American voters and legislators equal political power, as it transfers control over minimum wage from municipal officials elected by a majority-black electorate in Birmingham to state legislators elected by a majority-white electorate. According to the complaint, the Act—which the plaintiffs allege was racially motivated—"prohibits the majority-black electorate of . . . Birmingham from exercising their electoral power over local government[.]" D.E. 18 at ¶ 110. Count VIII alleges that the Act intentionally discriminates on the basis of race because it disproportionately impacts African-American citizens and denies them the ability to obtain the same economic opportunities available to predominantly white communities throughout the state. Count IX alleges an equal protection claim based on the political process doctrine.

In our *en banc* briefing notice, we asked the parties to address "[w]hether the plaintiffs have standing under Article III of the Constitution," and did not limit our

72

standing inquiry to the $10.10 hourly minimum wage sought by Ms. Lewis and Mr. Adams.  In their brief, Ms. Lewis and Mr. Adams argue that they have suffered injury-in-fact in two ways: (a) they earn hourly wages less than the $10.10 minimum prescribed by the Birmingham ordinance; *and* (b) they suffered a "denial[ ] of equal treatment" under the law, particularly with respect to their voting rights and participation in the political process.  *See* En Banc Br. for Mr. Adams, Ms. Lewis, NAACP, and Greater Birmingham Ministries at 17–18.  The Alabama Legislative Black Caucus and the other individual plaintiffs similarly contend that they have suffered injury-in-fact as black voters, and representatives of black voters, because the Act denies them equal access to the political process by nullifying the Birmingham ordinance.  *See* En Banc Br. for Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman, Priscilla Dunn, Juandalynn Givan, Mary Moore, William Muhammad, John Rogers, and Rodger Smitherman at 35–36.  *See also* Audio Recording of En Banc Oral Argument at 7:26–8:06 (plaintiffs' counsel explaining that there are two harms at issue, including the harm of "unequal treatment under the law").

The plaintiffs, in sum, also claim that the Act denies them equal political participation and power based on their race.  This harm, which is related to but broader than the abrogation of a $10.10 minimum hourly wage, constitutes a distinct concrete injury under Eleventh Circuit precedent.  *See Dillard v. Chilton Cty.*

73

*Comm'n*, 495 F.3d 1324, 1333 (11th Cir. 2007) (explaining that plaintiffs who have alleged that they are "subject to racial classification in voting systems" or "vote dilution . . . motivated by race" have been held to have a cognizable injury, whereas plaintiffs asserting generalized grievances about illegal electoral systems have not). And this harm is caused by the Act, not by Birmingham employers.

The majority asks only whether Ms. Lewis and Mr. Adams can obtain an ultimate economic benefit—a $10.10 minimum hourly wage—by suing the Attorney General. But the analysis should also address whether the plaintiffs' other alleged injury—being denied equal treatment by the Act—is traceable and redressable through this lawsuit against the Attorney General. As explained below, it is.[1]

\* \* \* \* \* \* \*

In evaluating standing to bring an equal protection claim, the Supreme Court has held in various contexts that it is the denial of equal treatment—not the ultimate inability to obtain the specific benefit sought—that constitutes the plaintiff's injury.

---

[1] The majority says in a footnote that the plaintiffs have never really asserted a denial of equal treatment as an injury. That is simply incorrect. First, the plaintiffs expressly allege such an injury many times in the amended complaint. These repeated references are not "traces." *See* D.E. 18 at ¶¶ 30–38, 89, 93, 97, 102, 109–111, 124–130, 132, 135–140, 142–145. Second, in their initial brief to the panel, the plaintiffs argued that, in addition to Ms. Lewis and Mr. Adams losing out on an hourly wage of $10.10, the racially-motivated Act caused some of them harm by denying them equal treatment under the law (e.g., by denying them equal participation in the political process). *See* Panel Br. for Ms. Lewis et al. at 47. The panel, having concluded that Ms. Lewis and Mr. Adams had Article III standing with respect to the $10.10 hourly wage, did not need to address this other alleged injury. *See, e.g., Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."). Having gone the other way as to the $10.10 hourly wage, the majority does not have the same luxury.

74

*See, e.g., Orr v. Orr*, 440 U.S. 268, 271–73 (1979) (husband had standing to raise an equal protection challenge to an Alabama statute providing that husbands, but not wives, may be required to pay alimony because his injury was a denial of equal protection, which could be remedied by a favorable decision even if he still had to pay alimony); *N.E. Fla. Chapter of Associated Gen. Contractors v. Jacksonville*, 508 U.S. 656, 666 (1993) (general contractors had standing to bring an equal protection challenge to a city ordinance that gave preferential treatment to minority-owned businesses in awarding city contracts because their injury was "the inability to compete on an equal footing in the bidding process, not the loss of a contract"); *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (applicant had standing to assert an equal protection claim against a university's use of race in its undergraduate admission process because he alleged that the university "had denied him the opportunity to compete for admission on an equal basis"); *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (certain plaintiffs "pleaded a particularized burden" sufficient to establish standing at the pleading stage because they alleged that the legislative act, through gerrymandering, diluted the influence of their votes as a result of packing or cracking in their legislative districts). The same is true in this case.

In the Supreme Court's words: "Our resolution of a statute's constitutionality often does not finally resolve the controversy as between [the parties]. . . . We do not deny standing simply because the [plaintiff], although prevailing . . . on the

75

federal constitutional issue, may or may not ultimately win [his] lawsuit." *Orr*, 440 U.S. at 273 (citations and internal quotation marks omitted). *See also Turner v. Fouche*, 396 U.S. 346, 362 (1970) (equal protection challenge to the system used to select the members of a school board: "We may assume that the appellants have no right to be appointed to the Taliaferro County board of education. But the appellants and the members of their class do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory qualifications."). Here, as in *Orr*, the Act "stand[s] as a total bar to [the plaintiffs'] relief" in the form of a $10.10 minimum hourly wage. *Orr*, 440 U.S. at 273. Although the plaintiffs' constitutional attack holds only the "promise of escape from the burden that derives from the [Act]," that "burden alone is sufficient to establish standing." *Id*.

Two cases from our sister circuits further illustrate how the injury-in-fact requirement should be characterized and analyzed in equal protection cases like this one. I summarize them below.

In *Citizens for Equal Protection v. Bruning*, 455 F.3d 859, 863 (8th Cir. 2006), *abrogated on other grounds by Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), the plaintiffs sued the governor and attorney general of Nebraska claiming that a state constitutional amendment that prohibited same-sex marriage violated the Equal Protection Clause. The defendants argued that the plaintiffs lacked standing because marriage licenses were not available to same-sex couples in Nebraska even without

76

the constitutional provision. *See id*. The Eighth Circuit was not impressed, explaining that "when the government erects a barrier making it more difficult for members of a group to obtain a benefit, '[t]he 'injury in fact' . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.'" *Id*. (quoting *N.E. Fla. Chapter*, 508 U.S. at 666). The Eighth Circuit also rejected the argument that the plaintiffs' claim should have been raised in a suit to compel a county clerk to marry two same-sex partners, because "that argument conflates the distinction noted in *N.E. Florida Contractors* between challenging a barrier and having a right to the ultimate benefit." *Id*. at 864.

In *Sullivan v. Benningfield*, 920 F.3d 401, 404 (6th Cir. 2019), a state judge offered a 30-day sentencing credit to inmates in White County, Tennessee, who agreed to submit to sterilization. Inmates who refused to submit to sterilization, and as a result were denied the sentencing credit, challenged the judge's orders under the Equal Protection Clause, arguing that they were subjected to differential treatment based on their procreative rights and their gender. *See id*. The defendants—the judge and the White County Sheriff—argued that the inmates did not establish an injury-in-fact because they could not show that they had the right to a sentencing credit. *See id*. at 408. The Sixth Circuit disagreed, explaining that the injury at issue was "'the denial of equal treatment resulting from the imposition of the barrier, not

77

the ultimate inability to obtain the benefit.'"  *Id*. (quoting *N.E. Fla. Chapter*, 508 U.S. at 666).

Here, the plaintiffs allege that the Act violates the Equal Protection Clause because it disproportionately impacts Birmingham's black residents and voters and was enacted with a discriminatory purpose.  Because these injuries cannot be laid at the feet of Birmingham employers—who do not act under color of state law—the majority is mistaken in concluding that in order to have Article III standing Ms. Lewis and Mr. Adams must demonstrate that a victory will generate them a $10.10 hourly wage.

* * * * * * *

Even on its own terms, the majority's analysis is flawed.  In holding that the purported injury is not redressable, the majority reasons that a judgment against the Attorney General would not require Birmingham employers to pay employees like Ms. Lewis and Mr. Adams $10.10 per hour pursuant to the City's ordinance.  The majority notes that the individual plaintiffs have not sued their employers, and reasons that the relief requested in this action would not bind those employers because they are not parties.  This rationale, however, conflates the indispensable party analysis of Rule 19 with Article III standing.

Under Rule 19(a), a party is required to be joined in an action if "in that person's absence, the court cannot accord complete relief among existing parties[.]"

78

Fed. R. Civ. P. 19(a)(1)(A).  If a party who is required to join under Rule 19(a) cannot be joined, the court must determine whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).

But even if a person who must be joined to accord complete relief under Rule 19(a) is not made a party, that does not mean that the plaintiffs lack standing under Article III.  That is because "[t]he redressability element of the Article III standing requirement and the '*complete* relief' referred to by Rule 19 are not identical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992).  *See also* Fed. R. Civ. P. 19 Advisory Committee's note to 1966 amendment ("Even if the court is mistaken in its decision to proceed in the absence of an interested person, it does not by that token deprive itself of the power to adjudicate as between the parties already before it[.]").  *Cf. Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273–74, 1279–80 (11th Cir. 2003) (first analyzing whether the plaintiff had standing to sue a government transit authority based on a provision of its contract with a non-party and then separately addressing whether the non-party was indispensable under Rule 19).

As Judge Wilson sets forth in his dissent, to have standing "a plaintiff *need not demonstrate anything more* than a substantial likelihood of redressability."  Wilson, J., Dissent at 58 (quoting *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116,

79

1126–27 (11th Cir. 2019)).  Thus, a claim may be redressable under Article III *even if* a third party who is not before the court must take some action (or be forced to take some action) to accord complete relief.  *See id.* at 58–62 (citing cases).  That is why, in *Made in the USA Foundation v. United States*, 242 F.3d 1300, 1310 (11th Cir. 2001), we agreed with the D.C. Circuit's rationale in *Swan v. Clinton*, 100 F.3d 973, 976–77 (D.C. Cir. 1996), that a "partial remedy" is sufficient for redressability. Relying in part on *Swan*, we held that labor organizations and a nonprofit group that promoted the purchase of American-made products had standing to challenge the constitutionality of NAFTA in a suit against the United States, even though a favorable decision (a) would not bind the President and could not compel him to withdraw from NAFTA, and (b) would not guarantee that Mexico or Canada would change the trade policies that caused the organizations' harm.  *See id.* at 1307–11. It was enough, we said, that it was "substantially likely that *at least some* of the . . . plaintiffs' alleged injuries [would] be redressed."  *Id.* at 1311 (citation and internal quotation marks omitted and emphasis added).

If the majority's logic were followed, each employee would have to sue his or her employer—because if only one employer were sued, the others would not be bound by the judgment as non-parties.  As there is no Rule 23 class certification mechanism for defendants, individual employees in Birmingham would need to

80

flood the federal and state courts with individual lawsuits against individual employers.[2]

According to the majority, the question of the Act's constitutionality would arise in a suit by employees against their employers in the following way. First, an employer sued under the City's ordinance presumably would raise the Act as an affirmative defense to liability. Second, in response the employee would argue that the Act is unconstitutional. Third, the Attorney General would intervene to defend the Act's validity. *See* Ala. Code § 6-6-227 (when the constitutionality of a state statute is challenged, "the Attorney General of the state shall . . . be served with a copy of the proceeding and be entitled to be heard"); *Bratton v. City of Florence*, 688 So. 2d 233, 234 (Ala. 1996) ("Section 6-6-227, Ala. Code 1975, provides that the attorney general shall be made a party when a state statute or municipal ordinance is challenged on constitutional grounds.").[3]

---

[2] The majority might respond that this result is unlikely because if a court in a suit against one employer determines that the Act is unconstitutional, its decision will constitute precedent that other employers would likely follow (even if they are not technically bound by the judgment). But why would employers choose to abide by that judgment, and not abide by a similar judgment against the Attorney General in this case?

[3] If we are permitted to speculate on future events, as the majority seems willing to do, I submit that the Attorney General of Alabama would not leave the defense of the Act to a Birmingham employer, no matter how well represented. Indeed, the Attorney General has recently sued the City of Birmingham for taking action in purported violation of state law. *See Alabama v. City of Birmingham*, -- So. 3d --, 2019 WL 6337424, at *2 (Ala. Nov. 27, 2019).

81

Thus, in that hypothetical lawsuit, the *same* parties as here—the individual employees and the Attorney General—would be the ones litigating the constitutionality of the Act.  If standing doctrine is meant to "serve[ ] to identify those disputes which are appropriately resolved through the judicial process," *Lujan*, 504 U.S. at 560 (citation and internal quotation marks omitted), why dismiss this action for failing to present a justiciable case or controversy when, as even the majority acknowledges, the *same* parties will ultimately be fighting the *same* controversy if employees are forced to sue their employers?

\* \* \* \* \* \* \*

"[C]ommon sense often makes good law," *Peak v. United States*, 353 U.S. 43, 46 (1957), but in my view the majority has made standing doctrine even more difficult to understand or defend.  If the plaintiffs here lack standing, it may be time to rethink the causation and redressability components of Article III standing.  *See, e.g.,* Robert J. Pushaw, Jr., *Justiciability and Separation of Powers: A Neo-Federalist Approach*, 81 Cornell L. Rev. 393, 480 (1996) ("Unlike injury, the 'causation' and 'redressability' requirements have little historical pedigree.  The Court's attempt to justify its refusal to redress certain injuries on classical separation-of-powers grounds is especially ironic in view of the Blackstonean maxim that the violation of every legal right must have a judicial remedy—a principle Federalists

82

considered essential to the preservation of liberty and the rule of law.") (footnotes omitted).  With respect, I dissent.